THE STATE EX REL. PETRO, APPELLEE, *v*. R.J. REYNOLDS TOBACCO COMPANY, APPELLANT, ET AL.

[Cite as *State ex rel. Petro v. R.J. Reynolds Tobacco Co.,* 104 Ohio St.3d 559, 2004-Ohio-7102.]

*Tobacco settlement — Tobacco advertising on matchbooks — Matchbooks are merchandise, and the free distribution of matchbooks advertising brand-name tobacco products in venues not limited to adults is prohibited by the Master Settlement Agreement — Judgment affirmed.*

(No. 2003-0860 – Submitted March 16, 2004 – Decided December 30, 2004.)

APPEAL from the Court of Appeals for Franklin County, No. 02AP-591, 152 Ohio App.3d 345, 2003-Ohio-1654.

_____

**PFEIFER, J.**

Factual and Procedural Background

{¶ 1} The state of Ohio on the relation of appellee, the Attorney General, sued defendant-appellant, R.J. Reynolds Tobacco Company ("RJR"), and other tobacco companies in 1997, alleging deceptive trade practices, antitrust violations, and other claims. The state sought various forms of relief, including recovery of Medicaid expenditures for alleged tobacco-related illnesses resulting from the use of tobacco products by Ohio Medicaid recipients. In November 1998, Ohio, along with the 45 other states and the government territories that had sued tobacco companies, settled the lawsuits with the nation's five largest tobacco companies, including RJR.

{¶ 2} The parties set forth the terms of their settlement in the Master Settlement Agreement ("MSA"). On November 25, 1998, the Court of Common Pleas of Franklin County entered a consent decree approving the MSA.

**{¶ 3}** Under the MSA, the tobacco companies agreed to pay the states and territorial governments several hundred billion dollars and to accept certain restrictions on their marketing efforts. For example, the companies agreed to refrain from any "advertising, promotion or marketing of Tobacco Products" targeted at youth. In addition, the companies agreed to refrain from certain defined marketing practices, including the "[u]se of [c]artoons" in advertisements, the display of certain "[o]utdoor [a]dvertising and [t]ransit [a]dvertisements" such as advertising in malls, video arcades, or in or near public transportation, and advertising on billboards and signs larger than 14 square feet, except within an "Adult-Only Facility." The companies further agreed to "bans on youth access to free samples" and gifts to underage persons based on proofs of purchase, and a limitation on tobacco brand-name sponsorships.

**{¶ 4}** The specific portion of the MSA at issue in this case is Section III(f), which provides:

**{¶ 5}** "Beginning July 1, 1999, no Participating Manufacturer may, within any Settling State, market, distribute, offer, sell, license or cause to be marketed, distributed, offered, sold or licensed (including, without limitation, by catalog or direct mail), any apparel or other merchandise (other than Tobacco Products, items the sole function of which is to advertise Tobacco Products, or written or electronic publications) which bears a Brand Name."

**{¶ 6}** This case concerns the distribution of paper matchbooks that contain RJR brand names and whether those matchbooks constitute "merchandise" under Section III(f) of the MSA. Appellee claims that in 2000, more than one billion matchbooks bearing RJR's signature brand names were distributed in the United States. RJR has had three separate matchbook programs in recent years. In one program, RJR purchases matchbooks with advertising promoting its brands and distributes them in bars, nightclubs, and lounges in conjunction with RJR's sponsorship of venues. In another program, RJR

distributes matchbooks at musical and sporting events that it may sponsor under the MSA. The venues where RJR distributes matchbooks pursuant to these two programs are restricted to adults, and the state does not now challenge RJR's distribution of matchbooks in those contexts.

{¶ 7} The state challenges RJR in this case for its distribution of matchbooks at venues that are not limited to adults. This distribution was achieved through RJR's relationship with D.D. Bean & Sons Company ("Bean"), a New Hampshire-based matchbook manufacturer and distributor. RJR contracted with Bean, not to purchase matchbooks, but to purchase space on those matchbooks for advertising. Bean has an extensive distribution network through which it sells matchbooks to wholesalers who distribute tobacco products. These distributors sell the matchbooks once again to a variety of retailers like tobacco specialty stores, convenience stores, grocery stores, gas stations, bars, and liquor stores. The branded matchbooks are then generally distributed free to consumers, primarily to people who purchase tobacco products.

{¶ 8} It has been said that "Close cover before striking" is the most printed phrase in the history of the world, and Bean's promotional materials relate the pervasiveness of branded matches, not just to the smoking set, but to millions of other consumers:

{¶ 9} "[Bean's] matches can be found in just about every convenience store, supermarket, liquor store, wholesale club and candy/tobacco stand in the country. While a direct link to smokers, matches are used and seen on a daily basis by millions of non-smokers as well. * * * [An advertiser's] logo or message will be picked up by millions of consumers in virtually every city and town in America. Matches are a direct link to smokers, but millions of non-smokers also use the product to light candles, stoves, grills, campfires, etc."

{¶ 10} Bean also relates that "for every person who picks up a matchbook, there are 8 other people who typically see it as well. These exposures, along with

other opportunities for non-smokers to see the match covers, * * * will give [an advertiser] an extended consumer reach."

{¶ 11} RJR claims that the focus of its matchbook marketing effort is adult smokers. To that end, RJR matchbooks have traditionally contained a statement that they are not to be distributed to minors. The wrappers on packs of matchbooks have long contained a similar statement. In 2001, RJR revised its package wrappers to include the statement that the matches are to be distributed "at no extra charge with the purchase of tobacco products."

{¶ 12} RJR matchbooks are given away for their advertising benefit, a practice consistent with the history of matchbooks in this country. In the 1890s, the Diamond Match Company opened a paper-matchbook-production facility in Barberton. A Diamond Match salesman, Henry Traute, is not only credited with putting an end to pocket fires – by insisting that the striker be moved from the inside to the outside of the matchbook – but also with sparking the use of matchbooks as an advertising medium. Traute's first customers were the Pabst Brewery in Milwaukee, which bought 10 million matchbooks advertising Pabst Blue Ribbon beer. James Duke, a tobacco tycoon, purchased 30 million books. William Wrigley ordered a billion books advertising Wrigley chewing gum. Over time, match manufacturers began distributing the matchbooks themselves. Consumers have become accustomed to the availability of free paper matchbooks.

{¶ 13} However, while most matchbooks are given away, many are purchased at retail. As the appellate court below observed, the United States Consumer Product Safety Commission has estimated that "12-20 percent of matchbooks are purchased at retail by consumers." Further, Bean manufactures and sells private-label matchbooks for supermarket chains, drug stores, and mass merchandisers, who offer them for sale to consumers. Matches sold at retail account for 40 percent of Bean's total business. Also, even RJR's Winston branded matchbooks have been sold at retail in Ohio.

4

**{¶ 14}** In 1999, a number of state attorneys general, including then Attorney General Betty Montgomery, raised concerns with RJR regarding its matchbook advertising. RJR was the only signatory to the MSA that continued to distribute branded matchbooks. Informal attempts to resolve the issue failed, and Ohio and 15 other states notified RJR that they would seek enforcement of the MSA.

**{¶ 15}** On March 19, 2001, the state moved for a show-cause order in contempt against RJR, contending that RJR's use of advertising matchbooks violated the portion of the consent decree incorporating MSA Section III(f)'s brand-name-merchandise ban. The state later withdrew the request for civil-contempt sanctions and instead sought a declaration that the MSA's bar on distributing brand-name merchandise included matchbooks bearing brand names. The parties submitted stipulated facts and memoranda for the court's consideration.

**{¶ 16}** On April 26, 2002, the trial court denied the state's motion, finding that the RJR matchbooks are not "merchandise" within Section III(f)'s prohibition of "apparel or other merchandise * * * which bears a Brand Name." Since the MSA does not contain a definition of "merchandise," the court applied a definition that included "goods, wares, commodities, finished articles, or wares held in temporary inventory by a merchant/business or which are bought and sold, wholesale, retail or in trade, in commerce, for profit." The trial court recognized that matchbooks constituted merchandise in the transactions between the manufacturer and the wholesalers and in the transactions between the wholesalers and the retailers. However, the fact that most matchbooks are given away at the retail level, the court found, disrupts "the merchandise definitional chain," transforming the matchbooks into nonmerchandise. The court found that while some matchbooks are sold at retail, most are not. The court found the purpose of

the matchbooks to be promotion and that they "have little or no indicia of merchandise as defined by either party." The trial court concluded:

{¶ 17} "In the context of this case, the matchbooks are a medium of communication designed to promote the sale of RJR's tobacco products. Having considered the context of the word 'merchandise' * * *, this Court believes that Mr. and Mrs. Joe Ohio would agree that the imprinted matchbooks are advertising."

{¶ 18} The state appealed from the trial court decision, and the Tenth District Court of Appeals reversed the judgment of the trial court. The appellate court disagreed with the trial court's conclusion that "merchandise somehow loses its character as merchandise because it is subsequently offered for free as a promotional item." The appellate court opined that the trial court's holding "would eviscerate the ban on marketing and distribution of brand name apparel and other merchandise contained in the MSA."

{¶ 19} The appellate court also addressed RJR's contention that its matchbooks never were "merchandise" in the first place because they are commonly given away. The court found that 12 to 20 percent of matchbooks are purchased at retail by consumers, a significant enough percentage for matchbooks to be considered merchandise: "To find otherwise would open the door for tobacco companies to flood the market with free goods in order to circumvent the ban on distribution of apparel or other merchandise."

{¶ 20} Finally, the appellate court found that the historical advertising function of matchbooks does not take them "outside the common understanding of the term 'merchandise,'" since the consumer sees their primary function as a source of fire. The court found no functional difference between matchbooks and T-shirts or other apparel that sport a tobacco brand name.

{¶ 21} The cause is before this court upon the acceptance of a discretionary appeal.

6

Law and Analysis

**{¶ 22}** In this case, we are called upon to resolve a narrow question: For the purposes of Section III(f) of the MSA, do paper matchbooks constitute "merchandise"? The parties disagree on how to interpret the term "merchandise." The state argues for a broad interpretation that would include items that are bought and sold at the wholesale level but that can be given away at the retail level. RJR argues that the term is ambiguous and that when using the MSA for context, the term should be read narrowly and should encompass only items typically bought and sold at retail. We find that common usage and the context of the MSA dictate a broader interpretation of "merchandise," one that includes matchbooks in its purview.

**{¶ 23}** The MSA, like all settlement agreements, is a contract between the parties. *Continental W. Condominium Unit Owners Assn. v. Howard E. Ferguson, Inc.* (1996), 74 Ohio St.3d 501, 502, 660 N.E.2d 431. We thus employ our usual method of contract construction in defining disputed terms. "The purpose of contract construction is to effectuate the intent of the parties," and that intent "is presumed to reside in the language they chose to employ in the agreement." *Kelly v. Med. Life Ins. Co.* (1987), 31 Ohio St.3d 130, 132, 31 OBR 289, 509 N.E.2d 411. Courts resort to extrinsic evidence of the parties' intent "only where the language is unclear or ambiguous, or where the circumstances surrounding the agreement invest the language of the contract with a special meaning." Id. The fact that the parties fail to specifically define a term within the contract does not make the term ambiguous. *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm* (1995), 73 Ohio St.3d 107, 108, 652 N.E.2d 684. Instead, common, undefined words appearing in a written instrument "will be given their ordinary meaning unless manifest absurdity results, or some other meaning is clearly evidenced from the face or overall contents of the instrument." *Alexander v. Buckeye Pipe*

*Line Co.* (1978), 53 Ohio St.2d 241, 7 O.O.3d 403, 374 N.E.2d 146, paragraph two of the syllabus.

{¶ 24} We look, then, to the ordinary meaning of "merchandise." The temptation is to define merchandise as Justice Stewart famously identified obscenity in *Jacobellis v. Ohio* (1964), 378 U.S. 184, 197, 84 S.Ct. 1676, 12 L.Ed.2d 793 (*Stewart*, J., concurring), and simply say that we know merchandise when we see it. We do, but we will delve deeper.

{¶ 25} The trial court presided over a battle of dictionaries, statutes, and case law and meticulously listed at least 15 definitions of "merchandise" from different sources submitted by the parties. The latest edition of Black's Law Dictionary, not yet published at the time of the trial court's decision, defines "merchandise" as:

{¶ 26} "1. In general, a movable object involved in trade or traffic; that which is passed from hand to hand by purchase and sale. 2. In particular, that which is dealt in by merchants; an article of trading or the class of objects in which trade is carried on by physical transfer; collectively, mercantile goods, wares or commodities, or any subjects of regular trade, animate as well as inanimate." Black's Law Dictionary (8th Ed.2004) 1008.

{¶ 27} Black's definition is not at odds with the trial court's distilled version of all the definitions that the parties submitted. The trial court wrote:

{¶ 28} "Nearly all the cited definitions of merchandise include goods 'bought and sold' or 'held for sale' in a commercial setting either by a merchant or to a consumer. A 'merchant' is defined as 'a person who buys and sells commodities for profit.' The Random House College Dictionary 836 (revised edition 1984)."

{¶ 29} We accept the definition of "merchandise" adopted by the trial court – "goods, wares, commodities, finished articles, or wares held in temporary inventory by a merchant/business or which are bought and sold, wholesale, retail

or in trade, in commerce, for profit" – and find that matchbooks fall within that definition.

**{¶ 30}** The manufacture and distribution of matchbooks are not altruistic enterprises. Only at one end of the stream of commerce are matchbooks commonly distributed without a charge. On at least two other levels – from manufacturers to wholesalers and wholesalers to retailers – matchbooks constitute goods that are bought and sold by merchants for profit. We agree with the appellate court that there is no transformational or redemptive power in being distributed free at retail. Matchbooks are indisputably in the stream of commerce, and once the plunge into that stream is made, the items remain merchandise. Metaphorically speaking, an item cannot enter the stream of commerce without getting wet.

**{¶ 31}** We fail to find a meaningful definitional distinction between items that are sold at retail and those that are sold at wholesale vis-à-vis whether they constitute merchandise. The matchbooks do not change in character once they leave the manufacturer. They are not incorporated into another, separate product. At either level of commerce, they fit within the ordinary meaning of merchandise — they are traded and trafficked by merchants for sale. The wholesale/retail debate seems solved by the apocryphal Winston Churchill quip: "We've established what you are, madame – now we're just quibbling over price."

**{¶ 32}** RJR would have us apply a definition of "merchandise" that includes the restriction "typically sold at retail." The evidence submitted by the parties indicates that paper matchbooks are indeed commonly sold at retail. Bean relates that 40 percent of the matchbooks it manufactures are sold at retail; United States Consumer Product Safety Commission has estimated that 12 to 20 percent of all matchbooks are purchased at retail by consumers. Thus, while not the norm, the retail sale of matchbooks is not rare. Matchbooks are often sold at the

retail level.  If there were a retail sale requirement for merchandise, the common sale of matchbooks in the retail marketplace would fulfill it.

{¶ 33} The fact that most matchbooks are given away is not noteworthy. Certainly, "free merchandise" is a type of "merchandise."  Free merchandise is attractive because it has worth but comes without a charge.  Its usefulness makes it desirable to possess.  Matchbooks are not a birthright or an entitlement.  People realize that they are manufactured by someone and sold to someone who distributes them with the hope that they will be a successful advertising tool.

{¶ 34} Moreover, RJR focuses on branded matchbooks.  That focus jumps a step ahead of the MSA.  The first question is whether matchbooks in general are merchandise; if they are, then they cannot contain a brand name of a tobacco-company MSA signatory.  In other words, would they be merchandise if they did not contain tobacco advertising?  We have already established above that nonadvertising matchbooks are sold at retail.  Unbranded matchbooks would thus fit even within RJR's narrow definition of merchandise.

{¶ 35} We find that the term "merchandise" in Section III(f) of the MSA is unambiguous and that its ordinary meaning encompasses matchbooks that are given away at retail.  However, we will still consider the context of the term within the agreement.

{¶ 36} The contract language leaves no doubt that a broad interpretation of the term "merchandise" is to be employed when analyzing the contract.  The section at issue here states: "[N]o participating Manufacturer may * * * distribute * * *or cause to be * * * distributed * * * any apparel or other merchandise (other than Tobacco Products, items the sole function of which is to advertise Tobacco Products, or written or electronic publications) which bears a Brand Name."  The parenthetical exclusions after the words "other merchandise" indicate that the parties to the contract have employed an expansive definition of "merchandise." The contract excludes from "merchandise" items "the sole function of which is to

10

advertise Tobacco Products." By implication, then, items that have a function besides advertising tobacco products do constitute merchandise.

{¶ 37} Advertising is not the sole purpose of paper matchbooks. They are popular among advertisers because they are so popular among consumers for their usefulness. They are a source of fire. They light birthday candles, pilot lights, firecrackers, and kindling; they can be used to mend a frayed shoelace, remove a stray thread; they can function as notepads, bookmarks, souvenirs, or, in a pinch, dental floss. Advertising is not their sole function.

{¶ 38} But for the "sole function" limitation, the contract language implies that advertising items such as placards, countertop displays, and signage would be considered merchandise pursuant to the contract. Those are items not typically sold at retail, yet they were specifically excepted from consideration as merchandise. The contract thus narrows for certain items the otherwise expansive definition. Matchbooks are not included in the limiting language and thus reside within the broader definition of "merchandise."

{¶ 39} In a larger sense within the agreement, the parties were agreeing to put an end to subtle but ubiquitous marketing of tobacco products. When in a retail establishment, one can expect to encounter the marketing efforts of cigarette purveyors. The ban on brand-name merchandise bans tobacco advertising from useful items that make their way into Americans' lives on a daily basis. We find matchbooks to be of the same character as key chains, pens, and clothing – items that, because of their usefulness, become tempting billboards for marketers. The MSA prohibition eliminates their availability for tobacco-product advertisement.

{¶ 40} We thus find that the ordinary meaning of the word "merchandise," as well as its use within the MSA, necessarily includes matchbooks.

{¶ 41} Accordingly, we affirm the judgment of the court of appeals.

Judgment affirmed.

MOYER, C.J., RESNICK, F.E. SWEENEY, LUNDBERG STRATTON and O'CONNOR, JJ., concur.

O'DONNELL, J., concurs in judgment only.

_____

Jones Day, Jeffrey J. Jones, Matthew A Kairis, Donald B. Ayer, Daniel H. Bromberg, Jack W. Campbell IV, and Thomas R. McCarthy, for appellant.

Jim Petro, Attorney General, Douglas R. Cole, State Solicitor, Stephen P. Carney, Senior Deputy Solicitor, Joseph L. Piccin, Susan C. Walker, and Michael D. Allen, Assistant Attorneys General, for appellee.

Vorys, Sater, Seymour & Pease, L.L.P.; J. Scott Jamieson and C. William O'Neill, urging reversal for amicus curiae, D.D. Bean & Sons Co.

Gregg Renkes, Alaska Attorney General; Terry Goddard, Arizona Attorney General; Mike Beebe, Arkansas Attorney General; Bill Lockyer, California Attorney General; Ken Salazar, Colorado Attorney General; Richard Blumenthal, Connecticut Attorney General; Mark J. Bennett, Hawaii Attorney General; Lisa Madigan, Illinois Attorney General; Steve Carter, Indiana Attorney General; Tom Miller, Iowa Attorney General; Albert Benjamin Chandler III, Kentucky Attorney General; Steve Rowe, Maine Attorney General; J. Joseph Curran, Jr., Maryland Attorney General; Tom Reilly, Massachusetts Attorney General; Mike Cox, Michigan Attorney General; Mike Moore, Mississippi Attorney General; Jeremiah W. Nixon, Missouri Attorney General; Mike McGrath, Montana Attorney General; Jon Bruning, Nebraska Attorney General; Brian Sandoval, Nevada Attorney General; Peter Heed, New Hampshire Attorney General; Peter C. Harvey, New Jersey Attorney General; Patricia Madrid, New Mexico Attorney General; Eliot Spitzer, New York Attorney General; Pamela Brown, Northern Mariana Islands Attorney General; W.A. Drew Edmonson, Oklahoma Attorney General; Hardy Myers, Oregon Attorney General; Gerald J. Papert, Pennsylvania Acting Attorney General, Joel M. Ressler, Chief Deputy

Attorney General, and Timothy P. Keating, Deputy Attorney General; Anabelle Rodriquez, Puerto Rico Attorney General; Patrick Lynch, Rhode Island Attorney General; Henry McMaster, South Carolina Attorney General; Lawrence E. Long, South Dakota Attorney General; Paul G. Summers, Tennessee Attorney General; Mark L. Shurtleff, Utah Attorney General; William H. Sorrell, Vermont Attorney General; Christine Gregoire, Washington Attorney General; Darrell V. McGraw, West Virginia Attorney General; Peg Lautenschlager, Wisconsin Attorney General; and Patrick J. Crank, Wyoming Attorney General; amici curiae, urging affirmance.

_____