NOT RECOMMENDED FOR PUBLICATION
File Name: 06a0783n.06
Filed: October 20, 2006

No. 05-4524

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT


REGAL CINEMAS, INC.,

     Plaintiff-Appellant,

         v.

FIRST INTERSTATE WILLOUGHBY, LTD.,

     Defendant-Appellee.

On Appeal from the United
States District Court for the
Northern District of Ohio

_____/


**Before:**     **GUY, GILMAN, and ROGERS, Circuit Judges.**

    **RALPH B. GUY, JR., Circuit Judge.**     Plaintiff Regal Cinemas, Inc., appeals from

the entry of summary judgment in favor of defendant First Interstate Willoughby, Ltd., on

Regal's claim that it mistakenly overpaid a total of $138,381.34 in rent for the years 2003 and

2004. The parties agree, as they did in their cross-motions for summary judgment, that this

case calls for a legal interpretation of the plain language of the parties' Lease and subsequent

Amendment. We conclude that the Amendment's method for calculating Percentage Rent

superceded the Lease's method, and therefore we affirm.

**I.**

    Regal and Interstate entered into a 20-year Lease in 1997, under which Regal rented

commercial property for use as a movie theater. Regal's rent obligation, set forth in Article

Four of the Lease, was comprised of the aggregate of: Minimum Rent (§ 4.03), Percentage

Rent (§ 4.04), and Additional Rent (§ 4.07). Calculation of the Additional Rent component

is not at issue. Minimum Rent started at $16 per square foot, and would increase in steps

over time. The following provisions related to Percentage Rent:

> Section 4.04: PERCENTAGE RENT.
>
> From the Rent Commencement Date through the end of the term and any extension or renewal thereof, Tenant's Percentage Rent per Calendar Year or Partial Calendar Year shall be Eight Percent (8%) of Gross Sales in excess of the product of twelve (12) times the Minimum Rent paid by Tenant during the same Calendar Year or Partial Calendar Year as the aforesaid Gross Sales.
>
> (a) Gross Sales.
>
> (i) Definitions: The phrase "**Gross Sales**" wherever used herein is defined to mean the aggregate of adjusted Gross Ticket Sales and Other Gross Sales. The phrase "**Gross Ticket Sales**" wherever used herein is hereby defined to mean all box office receipts for the sale of admission tickets to the Theater on the Premises. The phrase "**Other Gross Sales**" wherever used herein is hereby defined to mean all proceeds received from the sale of food and drinks; all proceeds received from the sale of records, books, magazines, toys or novelties sold in connection with a particular presentation; all proceeds from the sale or rental of videotape cassettes; all proceeds received from any vending machines and electronic game machines owned by Tenant . . . and receipts from all other business conducted in, at or from the demised Premises.

The terms Gross Sales, Gross Ticket Sales, and Other Gross Sales are further defined in §

4.04(a)(1)-(6) to exclude items such as discounts, refunds, returns, settlements, interest, and

taxes. Finally, § 4.04(b) provides an adjustment formula that reduces the Percentage Rent

based on the cost of renting a particular film.

> (b) Adjusted Gross Ticket Sales. Percentage Rent on Gross Ticket

Sales is based on Tenant renting each film shown at the Premises at the rental rate of 39% or less of Gross Ticket Sales for that film (the "39% Rate"). If Tenant's film rental payment to its distributor for a film is at a rate greater than the 39% Rate, whether expressed in those terms or expressed otherwise such as the 90/10 Rule, (herein the "Greater Rate), the Gross Ticket Sales for the film rented at the Greater Rate shall be deemed to be in the reduced amount for the purposes of Percentage Rent using the following "**Adjustment Formula**";

Subtract from the amount of actual Gross Ticket Sales in a Calendar Year the product of: (i) the difference between the Greater Rate and the 39% rate multiplied into (ii) the Gross Ticket Sales.

Illustratively:

Gross Ticket Sales = $10,000
Greater Rate = 44%
Greater Rate - 39% = 5%
5% of $10,000 = $500
Gross Ticket Sales
for Percentage Rent = $9,500

If in any of Tenant's Annual Reports, there are Gross Ticket Sales figures derived from the Adjustment Formula, Tenant shall in such Reports state the actual Gross Ticket Sales for films rented at the Greater Rate . . . and the amounts subtracted in arriving at the Report figures. Tenant shall also include with all such Reports true and complete copies of the distributor's percentage reports from Tenant to its distributors showing the film rental charges and payments.

These provisions governed the method for calculating Percentage Rent until 2001, when, in the wake of Regal's bankruptcy filing, Regal and Interstate executed an Amendment to the Lease.

The Amendment significantly changed Regal's rental obligations and avoided rejection of the Lease by Regal in the bankruptcy proceedings. In Paragraph 2, the Amendment modified Minimum Rent in two ways: (1) the Minimum Rent would be

constant through the end of the original lease term instead of increasing; and (2) a "Reduced Minimum Rent" would apply until Gross Ticket Sales exceeded $3,821,408 in a calendar year. During any extension of the lease period, however, Minimum Rent would increase according to the schedule in the original lease and "shall not be changed by this Amendment."

The crux of this appeal is the proper interpretation of Paragraph 3 of the Amendment, which modified the method for calculating Percentage Rent. The Amendment's method for calculating Percentage Rent is set forth in the first four sentences of Paragraph 3:

> 3.      **Modification of Percentage Rent.** Landlord and Tenant do hereby agree that effective as of the Calendar Year 2002 (Jan. 1, 2002 - Dec. 31, 2002) and every Calendar Year thereafter during which Tenant pays Reduced Minimum Rent . . . Tenant's Percentage Rent for each such Calendar Year shall be equal to Twenty Percent (20%) of all Gross Ticket Sales (as defined in Section 4.04 of the Lease) made in the Premises in excess of the Percentage Rent Breakpoint established by this Amendment. The "Percentage Rent Breakpoint" for purposes of this Amendment shall be Two Million Seven Hundred Fifty Thousand Dollars ($2,750,000.00). For example, if Gross Ticket Sales for Calendar Year 2002 are $3,500,000.00, the Percentage Rent shall be $150,000.00, calculated as follows: 3,500,000 - 2,750,000 = 750,000 x .20 = 150,000. Notwithstanding the foregoing, in no event shall Tenant's Percentage Rent under this Amendment exceed $214,281.60 for any Calendar Year that Tenant paid Reduced Minimum Rent.

Simply stated, in years that Regal paid Reduced Minimum Rent, the Percentage Rent due was equal to 20% of "all Gross Ticket Sales" in excess of $2.75 million, up to a maximum of $214,281.60 per year.

For the years 2003 and 2004, Regal paid Reduced Minimum Rent and Percentage Rent equal to 20% of its gross ticket sales. Regal concluded after an internal audit conducted at the end of 2004, that it had mistakenly overpaid by calculating the Percentage Rent under

Paragraph 3 based on actual Gross Ticket Sales as defined in § 4.04(a) of the Lease without taking into account the adjustment formula set forth in § 4.04(b) of the Lease. Regal alleges that it overpaid Interstate by a total of $138,381.34 during the two-year period.

Regal filed this action seeking to recover the alleged overpayment and requesting a declaration of rights. Regal and Interstate filed cross-motions for summary judgment, each asserting that there were no issues of material fact in dispute and asking the district court to interpret the plain language of the Lease and the Amendment. Rejecting Regal's interpretation of the relevant language, the district court denied Regal's motion, granted Interstate's motion, and entered summary judgment in favor of Interstate. This appeal followed.

## II.

Summary judgment is appropriate when there are no issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). In deciding a motion for summary judgment, the court must view the factual evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Our review of the district court's decision is *de novo. Johnson v. Karnes*, 398 F.3d 868, 873 (6th Cir. 2005); *McMullen v. Meijer, Inc.*, 355 F.3d 485, 489 (6th Cir. 2004) (when denial of summary judgment is based on legal grounds, our review is *de novo*).

There is no dispute that Ohio law applies. Under Ohio law, "'[t]he purpose of contract construction is to effectuate the intent of the parties,' and that intent 'is presumed

to reside in the language they chose to employ in the agreement.'" *State ex. rel. Petro v. R.J. Reynolds Tobacco Co.*, 820 N.E.2d 910, 915 (Ohio 2004) (citation omitted). Furthermore, "'[w]hen two parties have made a contract and have expressed it in a writing to which they have both assented as the complete and accurate integration of that contract, evidence, whether parol or otherwise, of antecedent understandings and negotiations will not be admitted for the purpose of varying or contradicting the writing.'" *Layne v. Progressive Preferred Ins. Co.*, 820 N.E.2d 867, 869 (Ohio 2004) (citation omitted).[1]

Regal and Interstate agree that the Lease and Amendment are fully integrated, unambiguous, and can be interpreted as a matter of law. Regal argues that the district court erred in finding that the Amendment's method for calculating Percentage Rent was intended to incorporate the definition of Gross Ticket Sales in § 4.04(a), but not the adjustment to Gross Ticket Sales found in § 4.04(b).

Regal's interpretation rests principally on a grammatical reading of the relevant phrase "all Gross Ticket Sales (as defined in Section 4.04 of the Lease)." That is, Regal argues that because § 4.04(b) is grammatically part of § 4.04, the Amendment incorporated the Adjustment Formula from § 4.04(b) into the definition of "Gross Ticket Sales." Had the reference been more specifically to § 4.04(a), Regal's argument would have been foreclosed. That it was not more specific, however, does not end our inquiry into the parties' intended meaning of the term "Gross Ticket Sales."

Turning as the Amendment directs to § 4.04 of the Lease for definition of the term

---

[1]Regal's assertion that the district court improperly relied on evidence outside the written agreements to interpret them is without merit.

"Gross Ticket Sales," we must begin with the express definition of that term found in §

4.04(a)(i)—also a part of § 4.04—stating that: "The phrase '**Gross Ticket Sales**' wherever

used herein is hereby defined to mean all box office receipts for the sale of admission tickets

to the Theater on the Premises." The terms Gross Sales, Gross *Ticket* Sales, and Other Sales,

were "further defined" in § 4.04(a)(ii) as excluding certain items such as discounts, refunds,

and taxes. Also, while Gross Ticket Sales was defined to mean *all* ticket sales, Gross Sales

is defined as the aggregate of *adjusted* Gross Ticket Sales and Other Sales. It is plain from

the definitions in § 4.04(a) that the parties intended Gross Sales, Gross Ticket Sales, and

*Adjusted* Gross Ticket Sales to mean different things. The parties' intention that the

adjustment not apply under the Amendment is plain from the fact that the Amendment

borrowed the term Gross Ticket Sales, and not either Adjusted Gross Ticket Sales or Gross

Sales (a component of which is Adjusted Gross Ticket Sales).

It is also clear that the Amendment did not incorporate all of § 4.04 because the

Amendment was intended to establish a substitute method for calculating Percentage Rent

in those years that Reduced Minimum Rent was paid. This was made eminently clear by the

following passage from Paragraph 3 of the Amendment, which stated:

> For the Calendar Years during which Tenant pays Reduced Minimum Rent, *the Percentage Rent set forth in this Amendment shall be paid by Tenant in lieu of the Percentage Rent set forth in Section 4.04 of the Lease, and the calculation of the amount of Percentage Rent due for each such Calendar Year shall be as provided in this Amendment instead of the Percentage Rent calculation provisions set forth in Section 4.04 of the Lease.* For any Calendar Year during which Tenant pays Original Minimum Rent (as opposed to Reduced Minimum Rent), Tenant's Percentage Rent obligation shall be as provided in Section 4.04 of the Lease instead of the Percentage Rent set forth in this Amendment.

(Emphasis added.) In fact, in another paragraph of the Amendment, the parties also agreed:

> 5. **Interpretation**. If any conflict between the terms of this Amendment and the terms of the Lease occurs, the terms of this Amendment shall govern and control in all respects. It is the intention of Landlord and Tenant with respect to the subject matter hereof that the *terms of this Amendment shall supercede and replace in each and every respect the terms and provisions of the Lease which the parties intend to modify pursuant to the terms hereof.*

(Emphasis added.) The parties unambiguously intended that the entire method for calculating Percentage Rent under § 4.04 of the Lease be replaced by the method for calculating Percentage Rent under Paragraph 3 of the Amendment for those years in which Reduced Minimum Rent was paid. To read the phrase "all Gross Ticket Sales (as defined in Section 4.04 of the Lease" so as to import an element of the Lease's method for calculating Percentage Rent would be unreasonable. The Amendment did not provide for *any* adjustment to Gross Ticket Sales, but rather directed that Percentage Rent be calculated as a percentage of *all* Gross Ticket Sales.

Finally, Regal argues that our construction of the Amendment renders § 4.04(b) and the term Adjusted Gross Ticket Sales superfluous. On the contrary, this construction does not read the Adjustment Formula out of the parties' agreements, but gives effect to the terms of the Amendment that create an alternative method for calculating Percentage Rent for years in which Reduced Minimum Rent is paid. By the terms of the Amendment, once Regal ceases paying Reduced Minimum Rent, the Percentage Rent calculations set forth in § 4.04—including the allowance for Adjusted Gross Ticket Sales from § 4.04(b)—will apply once again.

**AFFIRMED**.[2]

_____

[2]In a recently decided appeal, this court rejected Regal's interpretation of a strikingly similar amendment to a lease with another landlord that was also entered into during the bankruptcy proceedings. *Regal Cinemas, Inc. v. AVG Medina, LLC*, No. 05-4592, 2006 WL ____ (6th Cir. Oct. 12, 2006) (unpublished decision). As the dissent points out, the amendment in that case provided more specifically that percentage rent would be equal to 20% of "all Gross Ticket Sales (as defined in Section 4.04(a)(i) of the Lease)." *Id*. at slip op. p. 4. That, however, did not keep Regal from arguing (as in this case) that the adjustment formula in § 4.04(b) of the lease had been incorporated into the amendment's modified percentage rent calculation. Although the more specific reference to § 4.04(a)(i) made Regal's position weaker than here, this court's decision rejecting Regal's interpretation did not rest simply on the parenthetical reference to § 4.04(a)(i). Rather, this court found that the modified percentage rent provision in the amendment unambiguously established percentage rent to be a percentage of *all gross ticket sales*; made no mention of either the adjustment formula, or "adjusted gross ticket sales (which are not the same as gross ticket sales)"; and explicitly declared that the amendment's method for calculating percentage rent would be used *instead of* the method in § 4.04 of the lease. *Id*. at pp. 9-10. This is entirely consistent with our construction of the Amendment in this case.

**RONALD LEE GILMAN, Circuit Judge, concurring**. I fully concur in the analysis set forth in the lead opinion, but also recognize that reasonable jurists could disagree as to the proper interpretation of the contract language at issue in this case. This is well exemplified by the two opposing views expressed in the lead and dissenting opinions. On balance, however, I concur with the result reached in the lead opinion because of parties' course of performance.

The fact that Regal calculated and paid rent to Interstate without reference to the adjustment formula for the first two years following the Amendment lends credence to the conclusion that the parties did not intend for the adjustment formula to apply to their revised calculation of the rent. *See Doyle v. Allen Water District*, No. CA 96 04 0020-22, 1997 WL 205357, at *5 (Ohio Ct. App. March 25, 1997) (unpublished) (asserting, in a non-UCC contract case, that "evidence of a prior course of performance may be relevant to the construction of the contract at issue"); Restatement (Second) of Contracts § 202(4) (1979) ("Where an agreement involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement.")

Furthermore, Regal's performance under the amended lease cannot be characterized as an inadvertent continuation of its prior performance because, prior to the Amendment, Regal had applied the adjustment formula to reduce its rental obligation. Regal's omission of the adjustment formula from its rent calculation for the two-year period following the

Amendment thus represents an affirmative departure from its past performance under the original lease. This bolsters the conclusion that Interstate's interpretation of the Amendment more closely represents what the parties bargained for in amending the lease. Regal provides no explanation for why its newfound interpretation—even if textually plausible—should supercede the reasonable interpretation under which both parties performed for the two years immediately following the bargain they struck.

**ROGERS, J., dissenting.**   There are two ways of reading § 404 of the Lease. Interstate wins if § 4.04(a) and (b) are read as defining two different terms: "Gross Ticket Sales" and "Adjusted Gross Ticket Sales."   Regal wins if § 404(a) and (b) are instead read to provide two steps for defining a single term, "Gross Ticket Sales."   The contractual language is closer to the latter.   Interstate's version suffers from the lack of any indication in either § 404(a) or (b) that the parties are defining some term called "Adjusted Gross Ticket Sales."   When the word "adjusted" appears in § 404(a) to modify Gross Ticket Sales, it is not capitalized.   And the heading of § 404(b), "Adjusted Gross Ticket Sales," is simply not an operative part of the contract.   *See* § 23.01(a) ("The captions . . . appearing in this Lease are inserted only as a matter of convenience and in no way amplify, define, limit, construe, or describe the scope or intent of such Sections of this Lease nor in any way affect this Lease").   Regal's interpretation, on the other hand, is supported by the provision in § 404(b) that "Gross Ticket Sales" (not "Adjusted Gross Ticket Sales") shall be "deemed" to be the adjusted amount in certain circumstances (circumstances that did occur in this case).   That is, the parties intended to redefine "Gross Ticket Sales" in those circumstances.   While substitution of the word "defined" for the word "deemed" would have made the conclusion incontrovertible, the language is nonetheless pretty close to that.

Finally, the Amendment, by its plain terms, incorporated all of § 4.04, not just § 4.04(a).   Clearly, the parties could have drafted the Amendment to read "as defined in Section 4.04(a)(1) of the Lease."   Indeed, the plain language of Regal's lease amendment in a companion case that this circuit recently decided incorporates only §4.04(a)(1) and not all

of § 4.04.  *Constrast Regal Cinemas, Inc. v. AVG Medina LLC*, No. 05-4592, slip op. at 4 (6th Cir. Oct. 12, 2006).   The parties in this case referred to § 4.04 and not to §4.04(a) in particular.  I would accordingly reverse.