NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0033n.06

No. 20-3556

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
Jan 14, 2021
DEBORAH S. HUNT, Clerk

|  |  |
|---|---|
| TAGNETICS, INC., | ) |
| Plaintiff-Appellee, | ) |
|  | ) |
| v. | ) ON APPEAL FROM THE |
|  | ) UNITED STATES DISTRICT |
|  | ) COURT FOR THE |
| KENNETH KAYSER, et al, | ) SOUTHERN DISTRICT OF |
| Defendant-Appellant. | ) OHIO |
|  | ) |

BEFORE: **BATCHELDER, WHITE, and BUSH, Circuit Judges.**

**ALICE M. BATCHELDER**, **Circuit Judge.** The Appellees, Kenneth Kayser, Ronald Early, and Jonathan Hager (the "Creditors"), filed an involuntary bankruptcy petition against the Appellant, Tagnetics, Inc., for unpaid wages and salary related to their employment with Tagnetics. The parties negotiated a settlement. Before they drafted a formal settlement agreement, however, they agreed to key terms by email, which included, in part, a "full mutual releases (no carve outs)" clause. Finding a valid agreement, the bankruptcy court concluded that the release clause applied to the parties but not their related individuals and entities. Tagnetics appeals the bankruptcy court's interpretation. We **AFFIRM**.

**I.**

In March 2019, the Creditors filed an involuntary bankruptcy petition against Tagnetics to recover unpaid wages and salaries related to their employment. In mid-July, the parties started settlement negotiations, which focused primarily on the Creditors' payment schedule. On July 25,

the Creditors proposed a payment schedule, which Tagnetics initially rejected. And on July 26, the parties agreed over the phone to an amended payment schedule with additional terms. Tagnetics memorialized the agreement by an email that set out the specific terms for Tagnetics's payment to the Creditors:

> Payment of $90,000 total ($30,000 each) within three days of a fully executed agreement.
>
> The remaining schedule of payments as you proposed below, except in 12 and 18 months instead of 6 and 12 months.
>
> Full mutual releases (no carve outs)[.]
>
> Dismissal/withdrawal of claims by each of you to be filed within one day of receiving payment[.]

The Creditors accepted, and the parties subsequently informed the bankruptcy court that they had reached a settlement agreement.

Nineteen days later, Tagnetics drafted a formal settlement agreement and sent it to the Creditors. The draft, among other things, contained language warranting that each of the Creditors released Tagnetics and its related individuals and entities—specifically Tagnetics's entity, Compass Marketing—from all future claims:[1]

> In exchange for the consideration described herein, [the Creditors], on [their] own behalf and on behalf [of their] heirs, successors, and assigns, as well as all corporate and operating affiliates and related entities in which [the Creditors have] a controlling interest, hereby release[] and discharge[] Tagnetics, as well as its current and former parent companies, corporate and operating affiliates, subsidiaries, and related entities (including specifically Compass Marketing, Inc.), as well as each of their current and former directors, officers, shareholders or other equity holders, agents, employees, accountants, attorneys, and insurers . . . from any and all causes of action, claims, debts, costs, liabilities, and demands arising from the beginning of time until the date of this agreement. . . [The Creditors] understand[] that this is a GENERAL RELEASE.

Two days later, the Creditors responded to Tagnetics, objecting, in part, to the release provision:

> The release items . . . have some points in them that are not agreeable to all parties. This agreement is between Tagnetics and Kayser, Hager, Earley and

---

[1] The draft agreement contained three separate but identical releases for Kayser, Early, and Hager, respectively.

> does not need to specifically include Compass Marketing. If Compass is not an operating affiliate then they are not party to this settlement. Ken Kayser is not in agreement to include specific language in these releases including the Tagnetics release. This agreement was to resolve the dispute about our unpaid salaries as described in our employment agreements. These releases are taking very broad strokes that step outside these agreements trying to affect other agreements, loans, shareholders rights etc that are part of other Independent agreements executed between Tagnetics and Kayser, Earley.

After some back and forth about the inconsistencies between the negotiations and the draft agreement, Tagnetics moved the bankruptcy court to enforce the draft settlement agreement. The parties disputed the agreement's scope, and at issue here, whether the release provisions in the draft agreement accurately represented the July 26 agreement's "full mutual releases (no carveouts)" provision.

After holding an evidentiary hearing on Tagnetics's motion, the bankruptcy court held that the parties created an enforceable contract in the July 26 email and deemed all other offers and counteroffers unenforceable. It also held that the "[f]ull mutual releases (no carveouts)" provision applied to both the Creditors and Tagnetics but *not* their "affiliates, parent corporations, officers, directors or other undisclosed third parties."

Tagnetics appealed to the United States District Court for Southern District of Ohio, arguing that: (1) the release provision extended to Tagnetics's related third parties, and (2) if the provision did not extend to related third parties, there was no meeting of the minds, and therefore, no valid contract. The district court, in lockstep with the bankruptcy court's reasoning, affirmed. *Tagnetics, Inc. v. Kenneth Kayser, et al*, No. 3:19-cv-00363, 2020 WL 1987948, at *10 (S.D. Ohio Apr. 27, 2020).

The district court held that under Ohio law, the "full mutual releases (no carve out)" provision is clear and unambiguous. *Id.* at *8. It assessed the plain and ordinary meaning of each of the provisions' terms and determined that the bankruptcy court correctly limited mutual release

to the parties. *Id.* at *6. Next, the district court, looking at the parties' objective acts, concluded that the parties mutually assented to the terms of the July 26 agreement as they would ordinarily be understood. *Id.* at *10.

Tagnetics timely appeals.

## II.

"In appeals from the decision of a district court on appeal from the bankruptcy court, the court of appeals independently reviews the bankruptcy court's decision, applying the clearly erroneous standard to findings of fact and *de novo* review to conclusions of law." *Bank of Montreal v. Official Comm. of Unsecured Creditors*, 420 F.3d 559, 563 (6th Cir. 2005) (citation and quotation marks omitted).

"A settlement agreement is a type of contract and is governed by reference to state substantive law governing contracts generally." *Cogent Sols. Grp., LLC v. Hyalogic, LLC*, 712 F.3d 305, 309 (6th Cir. 2013) (internal quotation marks and citation omitted). Because Ohio residents formed the agreement in question in Ohio, Ohio law applies. Under Ohio law, the interpretation of a contract "is a matter of law subject to a de novo standard of review." *Kilko v. Lockhart*, No. 2012-L-003, 2012 WL 5328411, at *5 (Ohio Ct. App. Oct. 29, 2012).

## A.

We start with whether the parties created an enforceable contract on July 26.

Under Ohio law, "[e]ssential elements of a contract include an offer, acceptance, contractual capacity, consideration (the bargained for legal benefit and/or detriment), a manifestation of mutual assent and legality of object and of consideration." *Williams v. Ormsby*, 966 N.E.2d 255, 258 (Ohio 2012) (citation omitted). A contract containing those essential elements is enforceable so long as there was "a meeting of the minds of both parties . . . and the

contract [is] definite and certain." *Episcopal Ret. Homes v. Ohio Dep't of Indus. Rels.*, 575 N.E.2d 134, 137 (Ohio 1991). Note, however, that "all agreements have some degree of indefiniteness and some degree of uncertainty." *Kostelnik v. Helper*, 770 N.E.2d 58, 61 (Ohio 2002) (citation and quotation marks omitted).

"Ohio law does not require contracting parties to share a subjective meeting of the minds to establish a valid contract; otherwise, no matter how clearly the parties wrote their contract, one party could escape its requirements simply by contending that it did not understand them at the time." *216 Jamaica Ave., LLC v. S&R Playhouse Realty Co.*, 540 F.3d 433, 440 (6th Cir. 2008). "What it does require is that the terms of the agreement establish an objective meeting of the minds, which is to say that the contract was clear and unambiguous." *Id.* Expressions of assent are generally sufficient to show a meeting of the minds. *See Ford v. Tandy Transp., Inc.*, 620 N.E.2d 996, 1007 n.2 (Ohio Ct. App. 1993).

Here, Tagnetics concedes that the July 26 email exchange contains the key terms of the parties' agreement. And those terms were indeed definite. The email outlined the key payments, dates, and non-monetary terms of their settlement. The parties then mutually assented to those key terms—Tagnetics by offer via email and the Creditors by acceptance via their response email. *See Turoczy Bonding Co. v. Mitchell*, 118 N.E.3d 439, 444–45 (Ohio Ct. App. 2018) (explaining that although the parties contemplated a future memorialized agreement, their email communications unconditionally established a valid settlement agreement). Therefore, there was an objective meeting of the minds regarding the key terms included in the July 26 email exchange.

The July 26 agreement is enforceable.

**B.**

Next, we must interpret the full-mutual-release provision and determine whether it also releases Tagnetics's related third parties.

Under Ohio law, "[t]he purpose of contract construction is to effectuate the intent of the parties." *Kelly v. Med. Life Ins. Co.*, 509 N.E.2d 411, 413 (Ohio 1987). "The intent of the parties to a contract is presumed to reside in the language they chose to employ in the agreement." *Id.* "The fact that the parties fail to specifically define a term within the contract does not make the term ambiguous." *State ex rel. Petro v. R.J. Reynolds Tobacco Co.*, 820 N.E.2d 910, 915 (Ohio 2004). Instead, common undefined words "will be given their ordinary meaning unless manifest absurdity results, or some other meaning is clearly evidenced from the face or overall contents of the instrument." *Id.*

"[W]here the terms of a contract are clear and unambiguous, extrinsic evidence may not be used as an aid in interpretation." *Whitley v. Canton City Sch. Dist. Bd. of Educ.*, 528 N.E.2d 167, 168 (Ohio 1988); *Transtar Elec. v. A.E.M. Elec. Servs. Corp.*, 16 N.E.3d 645, 648 (Ohio 2014) ("When the language of a written contract is clear, a court may look no further than the writing itself to find the intent of the parties." (internal quotation and citation omitted)). "Contract language is ambiguous if it is susceptible to two or more reasonable interpretations." *Willoughby Supply Co. v. Villhauer*, 113 N.E.3d 973, 977 (Ohio Ct. App. 2018) (internal quotation and citation omitted). If, however, the terms are clear, a court "cannot in effect create a new contract by finding an intent not expressed in the clear language employed by the parties." *Alexander v. Buckeye Pipe Line Co.*, 374 N.E.2d 146, 150 (Ohio 1978).

We look, then, to the ordinary meaning of each of the words in the phrase "full mutual releases (no carveouts)." Tagnetics acknowledges that courts in Ohio have defined "mutual" to

mean "[c]ommon to both parties" or "reciprocal." Black's Law Dictionary defines "mutual release" as "[a] simultaneous exchange of releases of legal claims held by two or more parties against each other." Black's Law Dictionary (11th Ed. 2019) (defining "mutual release" under the definition of "release"). The words "full" and "(no carve outs)" modify "mutual releases"; the phrase therefore means that all claims without exception are subject to the mutual releases. *See Alexander*, 374 N.E.2d at 150 (explaining that when a court interprets a contact, it reads terms in conjunction with their surrounding terms).

Tagnetics argues that "full" modifies "mutual releases," so that the phrase encompasses release of all of Tagnetics's unspecified "related third parties, such as parent companies, subsidiaries, affiliates, officers, directors, heirs, and personal representatives." But Tagnetics's interpretation of "full" is not reasonable in the context of the July 26 agreement, which was between Tagnetics and the Creditors, without any reference to any third party. *See Willoughby*, 113 N.E.3d at 977. If the parties had intended to include third parties in the mutual-release provision, "they could have easily so stated," but they did not. *Alexander*, 374 N.E.2d at 150. The release provision, therefore, does not apply to Tagnetics's related third parties.

Tagnetics also argues that interpreting "full" as having the same meaning as "no carve outs" would violate the canon against surplusage. But Tagnetics misapprehends that canon. It is "not a tool for *creating* an ambiguity in the first place." *TMW Enters., Inc. v. Fed. Ins. Co.*, 619 F.3d 574, 578 (6th Cir. 2010). As we have already explained, "full," in the first instance, is unambiguous; it becomes ambiguous only if we apply the rule against surplusage. *See id.* ("Where there are two ways to read the text—and the one that avoids surplusage makes the text ambiguous—applying the rule against surplusage is, absent other indications, inappropriate." (quotations and citation omitted)).

Next, Tagnetics attempts to analogize this case to several out-of-state cases that deal with the question of general releases. Each case cited concerned a general release provision that expressly included third parties. But each case is distinguishable for the same reason: the agreements contained a general release provision before the parties' mutual assent. That is not so here.

Finally, Tagnetics presents arguments that rely on extrinsic evidence. But because the July 26 agreement is clear and unambiguous, those arguments are unavailing. The bankruptcy court correctly limited the release provision to the Creditors and Tagnetics.

## III.

For the foregoing reasons, we **AFFIRM** the bankruptcy court's judgment.

WHITE, Circuit Judge, concurring. I join in the affirmance. I write separately to note that although the release does not by its terms expressly include the affiliated persons and entities at issue here, it may nevertheless operate to release some related parties in a future lawsuit depending on the asserted bases for liability, the parties' relationship to Tagnetics, and the applicable law regarding corporate liability, agency, and releases.