*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 08a0170p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

JILL B. SAVEDOFF, individually and on behalf of all
others similarly situated,

*Plaintiff-Appellee,*

*v.*

ACCESS GROUP, INC.,

*Defendant-Appellant.*

No. 07-3670

>

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 06-00135—James S. Gwin, District Judge.

Argued: March 11, 2008

Decided and Filed: May 2, 2008

Before: KEITH, CLAY, and GILMAN, Circuit Judges.

---

**COUNSEL**

**ARGUED:** Robert Binder, FOLEY & LARDNER, Milwaukee, Wisconsin, for Appellant. David
H. Weinstein, WEINSTEIN, KITCHENOFF & ASHER, Philadelphia, Pennsylvania, for Appellee.
**ON BRIEF:** Robert Binder, FOLEY & LARDNER, Milwaukee, Wisconsin, Patrick T. Lewis,
PORTER, WRIGHT, MORRIS & ARTHUR, Cleveland, Ohio, for Appellant. David H. Weinstein,
WEINSTEIN, KITCHENOFF & ASHER, Philadelphia, Pennsylvania, for Appellee.

CLAY, J., delivered the opinion of the court, in which KEITH, J., joined. GILMAN, J. (p.
14), delivered a separate opinion concurring in the result.

---

**OPINION**

---

CLAY, Circuit Judge. In this diversity class action, brought pursuant to the Class Action
Fairness Act, 28 U.S.C. § 1332(d) (2006), Defendant Access Group, Inc. ("Access Group") appeals
the district court's denial of Access Group's motion for summary judgment and its grant of Plaintiff
Jill B. Savedoff's ("Savedoff") motion for partial summary judgment on the issue of liability for
Savedoff's breach of contract claims. For the reasons that follow, we **AFFIRM** in part and
**REVERSE** in part the judgment of the district court, and **REMAND** the case for further
proceedings consistent with this opinion.

1

# I. BACKGROUND

Access Group is a non-profit organization formed by a consortium of major law schools to assist law students as well as other professional students in procuring loans to finance their education. In order to obtain a loan, Access Group requires a student borrower to submit a loan application and sign a promissory note (the "student loan contract" or "Promissory Note") containing the terms of the loan. Once Access Group confirms the loan application and the current interest rate, Access Group disburses the loan funds to the borrower's educational institution.

Under the student loan contract, the period between the disbursement of the loan funds up to the first day of the repayment period, which is usually nine months after the borrower's graduation, is called the "interim period." During this interim period, the loan accrues interest, but the borrower is not required to pay the interest that accrues.

After this interim period, the loan enters the "repayment period," which typically lasts twenty years. Access Group offers borrowers three repayment options: Easy Pay Equal, Easy Pay 2 Step, or Easy Pay 3 Step. Easy Pay Equal requires the borrower to make amortized payments of interest and principal throughout the twenty year term of the loan. Easy Pay 2 Step allows the borrower to pay only interest for the first two years of the repayment period and then, for the remainder of the loan term, to make amortized payments of interest and principal. Easy Pay 3 Step provides for two years of interest only payments, followed by three years of interest with partial principal payments, concluded with amortized payments of interest and principal for the remainder of the loan term. Borrowers select their choice of repayment option two to three months before the repayment period begins.

The terms of the borrower's repayment of the loan is governed by paragraph E of the student loan contract, which provides:

1. Interim Period – During the Interim Period you [Access Group] will send me [borrower] quarterly statements showing my loan disbursements and the interest that accrues on my loan. Statements will be sent to the address shown on your records, as provided in Paragraph L. The quarterly statements will cover periods beginning on the initial Disbursement Date and thereafter on the first date of each January, April, July, and October. I may, but am not required to, make payments of interest or principal during the Interim Period. You may add any interest that I do not pay during the Interim Period to the principal balance as described in Paragraph D.3.[1]

2. Repayment Period – During the Repayment Period you will send me periodic statements on my loan. The periodic statements will cover periods beginning on the first day of the Repayment Period and on the same day each following month. I will make consecutive monthly payments in the amounts and on the payment due dates shown on my periodic statements until I have paid all the principal and interest and any other charges I may owe under this Promissory Note.

3. Repayment Terms – The amounts shown on my periodic statements will be consecutive monthly installments of the principal and interest calculated each Change Date to equal the amount necessary to amortize the unpaid principal balance (including any capitalized interest) of my loan (as of the date of calculation) in equal

---

[1]Paragraph D.3 provides: "You [Access Group] may, at your option, add all accrued and unpaid interest on this Promissory Note to the principal balance of the loan on the last day of the Interim Period." J.A. at 105.

monthly installments of principal and interest at the Variable Rate then in effect over the number of months remaining in the Repayment Period.[2]

4. Amounts Owing at the End of the Repayment Period – Since interest accrues daily upon the unpaid balance of my loan, if I make payments after my payment due dates, I may owe additional interest. If I have not paid my late charges, I will also owe additional amounts for those late charges. In such case you will increase the amount of my last monthly payment to the amount necessary to repay my loan in full.[3]

5. Minimum Repayment – Notwithstanding Paragraph E.3, I agree to pay at least $50 each month (principal and interest) or the unpaid balance, whichever is less. I understand that this may result in my loan being paid off in less than 240 months.

J.A. at 105-06.

Paragraph A of the student loan contract contains a general contractual obligation to pay the loan amount, which reads:

I, [the borrower], intending to be bound, promise to pay to your [Access Group's] order on the terms of this Promissory Note all of the principal sum of [the amount loaned] to the extent it is advanced to me or paid on my behalf, and as set out below, interest on such principal sum, interest on any unpaid accrued interest added to the principal balance, a supplemental guarantee fee as set out below . . . late charges, and in the event of default, and to the extent permitted by applicable law, costs of collection, and reasonable attorneys' fees.

J.A. at 105. Each contract also contains a provision stating that the contract will be governed by federal law and the laws of the state of Ohio.

---

[2]Paragraph D.2 defines the terms "Variable Rate" and "Change Date" as follows:

The Variable Rate is equal to the Current Index, plus (a) 2.50% per annum if my Access Group Program is the Medical Residency Loan or Medical Access Loan Program, (b) 2.75% per annum if my Access Group Program is the Dental Access or Dental Residency/Dental Board Examination Loan Program, (c) 2.80% per annum if my Access Group Program is the Law Access or Bar Examination Loan Program, (d) 3.00% per annum if my Access Group Program is the Business Access Loan Program, or (e) 3.20% per annum if my Access Group Program is the Graduate Access Loan Program. In no event shall the Variable Rate be more than 25% per annum. The Variable Rate will change quarterly on the first day of each January, April, July and October (the "Change Date(s)") if the Current Index changes. The Current Index for any calendar quarter beginning on a Change Date (or for any shorter period beginning on the Disbursement Date and ending on the first Change Date) is the most recent Index as of the Change Date. The Index is the coupon equivalent yield of the 13-week U.S. Treasury bills for the last auction date of the prior calendar quarter, as reported in *The Wall Street Journal*. If the Current Index is no longer available, you [Access Group] will choose, in your sole discretion, a comparable substitute.

J.A. at 105.

[3]Paragraph F, entitled "Late Charges," provides:

I [the borrower] will pay a late charge of $25.00 if I fail to make any part of an installment payment within 15 days after it becomes due. I will pay only one late charge for an installment payment, regardless of the number of days it is late.

J.A. at 106.

Between August 13, 1999 and June 25, 2002, Savedoff entered into a series of student loan contracts with Access Group, containing the provisions described above and totaling $ 71,858.00, to finance her legal education.  Prior to the start of her repayment period, Savedoff elected to make her payments under Access Group's Easy Pay 3 Step repayment option.  At the end of the interim period, Access Group, pursuant to paragraph D.3 of the student loan contracts, added all outstanding interest that had accrued during the interim period to the original loan amount, creating a new principal balance of $88,477.00.

The repayment period for Savedoff's loan commenced on March 20, 2003.  For the next two years, pursuant to the Easy Pay 3 Step repayment plan, Access Group sent Savedoff monthly statements which listed the amount of interest owed on the loan and requested a monthly interest payment of $296.36.  As required by the student loan contracts, the interest rate on Savedoff's loan was adjusted quarterly by Access Group to reflect changes in the standard index.  These interest rate changes were indicated on Savedoff's monthly statements.  However, Savedoff's monthly payment was not increased.[4]  As a result, during the first two years of repayment, Savedoff accrued around $650 of interest on her loan that was not paid for in her monthly interest payments.  Like both parties as well as the district court, we will, for purposes of this opinion, refer to this accrued, but unpaid, interest as "Additional Interest."

In March of 2005, at the end of the first phase of repayment, Access Group capitalized the Additional Interest by adding it to the principal balance of Savedoff's loan.  Access Group then charged and collected interest from Savedoff on this Additional Interest.  Access Group had engaged in this practice with all of its Easy Pay 2 Step and Easy Pay 3 Step loans since 2000.  In October of 2004, prior to the commencement of the instant suit, Access Group voluntarily discontinued this practice as to all new loans issued.

On January 19, 2006, in response to Access Group's capitalization of the Additional Interest on her loan, Savedoff filed a federal class action complaint in the United States District Court for the Northern District of Ohio[5] against Access Group, the Kentucky Higher Education Student Loan Corporation ("KHESLC"), and the National City Corporation ("National City").[6]  In her initial complaint, Savedoff alleged claims of breach of contract and unjust enrichment based on Access Group's addition of Additional Interest to the principal balance of her loans and the loans of other class members.  On April 27, 2006, Savedoff filed an amended complaint against the same parties alleging the same claims.  All defendants filed timely answers to both of these complaints.

On April 19, 2006, Savedoff filed a motion for class certification.  The parties filed a joint proposed stipulation concerning class definition and class certification on August 15, 2006.  On November 6, 2006, the district court certified the class as:

---

[4]The parties have failed to provide the Court with a clear explanation for why Savedoff's monthly payment amount was not increased to reflect the change in interest rates during this two year period.  The only reason suggested by the parties for this failure to adjust the payment amounts is the convenience for the student borrower of having a non-fluctuating monthly payment obligation during this first phase of repayment.

[5]Federal jurisdiction for this complaint was based on the Class Action Fairness Act which extends the jurisdiction of district courts to "any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interests and costs, and is a class action in which . . . any member of a class of plaintiffs is a citizen of a State different from any defendant."  28 U.S.C. § 1332(d)(2)(A).  The parties do not dispute this basis for federal jurisdiction.  Savedoff is a resident of Maryland and Access Group is a corporation incorporated under the laws of Delaware with its principal place of business in Delaware.  Due to the size of the plaintiff class, the amount in controversy exceeds $5,000,000 in the aggregate.

[6]KHESLC and National City are other student loan providers who had handled Savedoff's law school loans.  They were both eventually dismissed from Savedoff's suit without prejudice by the parties' stipulation.

> All persons who are borrowers under an EZ Pay Plan on whose Student Loans any of the Defendants have, since January 1, 1993, compounded accrued interest after commencement of the repayment period. Excluded from the Class are those borrowers whose accrued interest has been compounded solely pursuant to a written forbearance agreement with the lender.

J.A. at 291.

In July of 2006, after Savedoff's amended complaint had been filed, Access Group decided to "uncapitalize" all Additional Interest that had been capitalized on the loans issued between 2000 and 2004. To do this, Access Group effectively repaid the interest on the Additional Interest that had been collected from borrowers by applying the portion of any payments that had previously been used to pay interest on the Additional Interest to reduce the principal balance or other interest owed on borrowers' loans. Access Group then began to charge the Additional Interest to borrowers as part of their monthly payments. Access Group collected the Additional Interest by applying borrowers' monthly payments to pay off accrued interest and Additional Interest before applying the payments to reduce the principal balance of the borrowers' loans.

Based upon these changes in its manner of collecting Additional Interest, Access Group filed a motion for summary judgment on October 17, 2006. Shortly thereafter, on November 9, 2006, Savedoff filed her second amended and supplemental complaint against Access Group, which dropped Savedoff's earlier claims and instead alleged that Access Group had breached the terms of the class members' student loan contracts in two distinct ways: (1) by compounding the Additional Interest which had accrued during the first two years of each class member's loan repayment period; and (2) by applying each class member's monthly payments to pay off this Additional Interest before applying the payments to reduce the loan principal. Access Group filed a timely answer to this second amended complaint on November 22, 2006.

On December 27, 2006, Savedoff filed a motion for partial summary judgment on the question of Access Group's liability, and Access Group renewed its motion for summary judgment. On February 26, 2007, the district court granted Savedoff's partial motion for summary judgment regarding liability and denied Access Group's motion for summary judgment. *Savedoff v. Access Group*, No. 1:06-CV-135, 2007 WL 649278, at *1 (N.D. Ohio Feb. 26, 2007). In particular, the district court found that: (1) Savedoff's claim that Access Group had breached its contracts with class members by compounding the Additional Interest was meritorious and not moot; and (2) Access Group had breached its contracts with class members by applying borrowers' monthly payments to pay off the Additional Interest before applying that amount to reduce the loan principal. *See id*. at *3-7.

On April 20, 2007, as part of its remedy determination, the district court issued an injunction which: (1) ordered Access Group to "refrain from charging compound interest on class members' EZ Pay loans in the 'repayment phase' of the loan period" and to "finish repaying any remaining compounded interest to class members"; (2) prohibited Access Group from "applying class members' monthly payments to Additional Interest prior to applying such payments to amortize each class member's unpaid principal balance, except to the extent the borrower's written loan agreement expressly authorizes Access Group to apply payments in such a manner"; and (3) prohibited Access Group from "requiring class members to pay, before the final payment due under the applicable loan, any amount of Additional Interest." J.A. at 305-06.

On May 18, 2007, Access Group filed this timely appeal, contesting both the district court's April 20, 2007 injunctive order and its February 27, 2006 entry of partial summary judgment for Savedoff as well as its denial of summary judgment to Access Group. Shortly thereafter, on May 24, 2007, Access Group filed a motion to stay, pending appeal, the portions of the district court's

injunctive order establishing that: (1) Additional Interest obligations are subordinate to amortized principal payments; and (2) Additional Interest is not chargeable until a balloon payment at the end of the loan term. The district court granted Access Group's motion on June 12, 2007. *Savedoff v. Access Group*, No. 1:06-CV-135, 2007 WL 1703566, at *1-2 (N.D. Ohio June 12, 2007).

## II. DISCUSSION

On appeal, Access Group argues that the district court's grant of summary judgment to Savedoff and denial of summary judgment to Access Group on Savedoff's breach of contract claims was inappropriate. However, Access Group does not contest the district court's determination that it breached Savedoff's student loan contracts by adding Additional Interest to the principal balances of borrowers' accounts.[7] Rather, Access Group challenges the district court's conclusion that it breached the student loan contracts by applying borrowers' monthly payments to reduce the amount of Additional Interest owed to Access Group. The resolution of this latter issue turns upon an interpretation of the repayment provisions of the student loan contracts.

### A. Standard of Review

We review a district court's grant of summary judgment *de novo*. *Mutchler v. Dunlap Mem'l Hosp.*, 485 F.3d 854, 857 (6th Cir. 2007). Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In evaluating the evidence presented, a court must draw all inferences in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A genuine issue of material fact exists when there are "disputes over facts that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587.

### B. Applicable Law

We generally apply the substantive law of the forum state to actions brought pursuant to our diversity jurisdiction. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). When interpreting contracts in a diversity action, we also generally enforce the parties' contractual choice of governing law. *See, e.g.*, *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 596 (1991); *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972). As the parties do not dispute that the student loan contracts at issue are governed by Ohio law, we apply Ohio law to the parties' contractual dispute.

In applying Ohio law, we must "follow the decisions of the state's highest court when that court has addressed the relevant issue." *Talley v. State Farm Fire & Cas. Co.*, 223 F.3d 323, 326 (6th Cir. 2000). If the issue has not been directly addressed, we must "anticipate how the relevant state's highest court would rule in the case and are bound by controlling decisions of that court." *In re Dow Corning Corp.*, 419 F.3d 543, 549 (6th Cir. 2005). "Intermediate state appellate courts' decisions are also viewed as persuasive unless it is shown that the state's highest court would decide the issue differently." *Id.*

---

[7] As Access Group has failed to challenge this aspect of this district court's opinion, we affirm the district court's grant of summary judgment in favor of Savedoff on her first breach of contract claim. We agree with the district court's conclusion that: (1) Access Group's compounding of the unpaid interest accrued during the first two years of repayment was not permitted by the student loan contracts; and (2) Access Group's voluntary discontinuation of this practice did not render Savedoff's claim moot. *See Savedoff v. Access Group*, No. 1:06-CV-135, 2007 WL 649278, at *3-4 (N.D. Ohio Feb. 26, 2007).

## C. Analysis

### 1. Legal Framework

To establish a breach of contract claim in Ohio, a plaintiff must prove, by a preponderance of the evidence, "the existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff." *Jarupan v. Hanna*, 878 N.E.2d 66, 73 (Ohio Ct. App. 2007) (quoting *Powell v. Grant Med. Ctr.*, 771 N.E.2d 874, 881 (Ohio 2002)); *accord Lawrence v. Lorain Cty. Comm. College*, 713 N.E.2d 478, 549 (Ohio 1998). A party breaches a contract if he fails to perform according to the terms of the contract or acts in a manner that is contrary to its provisions. *See Jarupan*, 878 N.E.2d at 73. The only element at issue in the present case is whether Access Group's application of borrowers' monthly payments to reduce the amount of Additional Interest owed was contrary to and thus a breach of the student loan contracts. To answer this question, we must interpret the repayment provisions of the student loan contracts.

Under Ohio law, the interpretation of written contract terms, including the determination of whether those terms are ambiguous, is a matter of law for initial determination by the court. *Parrett v. Am. Ship Bldg. Co.*, 990 F.2d 854, 858 (6th Cir. 1993) (applying Ohio law); *Potti v. Duramed Pharmaceuticals, Inc.*, 938 F.2d 641, 647 (6th Cir. 1991) (applying Ohio law); *see also Inland Refuse Transfer Co. v. Browning Ferris Indus. of Ohio, Inc.*, 474 N.E.2d 271, 272-73 (Ohio 1984) ("If a contract is clear and unambiguous, then its interpretation is a matter of law and there is no issue of fact to be determined. However, if a term cannot be determined from the four corners of a contract, factual determination of intent or reasonableness may be necessary to supply the missing term."). "The role of courts in examining contracts is to ascertain the intent of the parties." *City of St. Marys v. Auglaize Cty Bd. of Commrs.*, 875 N.E.2d 561, 566 (Ohio 2007). "The intent of the parties is presumed to reside in the language they choose to use in their agreement." *Graham v. Drydock Coal Co.*, 667 N.E.2d 949, 952 (Ohio 1996); *accord State ex. rel Petro v. R.J. Reynolds Tobacco Co.*, 820 N.E.2d 910, 915 (Ohio 2004). "Where the terms in a contract are not ambiguous, courts are constrained to apply the plain language of the contract." *City of St. Marys*, 875 N.E.2d at 566; *accord Alexander v. Buckeye Pipe Line Co.*, 374 N.E.2d 146, 150 (Ohio 1978) ("[W]here the terms in an existing contract are clear and unambiguous, this court cannot in effect create a new contract by finding an intent not expressed in the clear language employed by the parties."). However, "[e]xtrinsic evidence is admissible to ascertain the intent of the parties when the contract is unclear or ambiguous, or when circumstances surrounding the agreement give the plain language special meaning." *Graham*, 667 N.E.2d at 952; *accord R.J. Reynolds*, 820 N.E.2d at 915. Nevertheless, a court "is not permitted to alter a lawful contract by imputing an intent contrary to that expressed by the parties" in the terms of their written contract. *Westfield Ins. Co. v. Galatis*, 797 N.E.2d 1256, 1261-62 (Ohio 2003).

Contractual language is ambiguous "only where its meaning cannot be determined from the four corners of the agreement or where the language is susceptible of two or more reasonable interpretations." *Covington v. Lucia*, 784 N.E.2d 186, 190 (Ohio Ct. App. 2003) (quoting *Potti*, 938 F.3d 641 at 647); *see also King v. Nationwide Ins. Co.*, 519 N.E.2d 1380, 1383 (Ohio 1988); *United States Fid. & Guar. Co. v. St. Elizabeth Med. Ctr.*, 716 N.E.2d 1201, 1208 (Ohio Ct. App. 1998). "[C]ourts may not use extrinsic evidence to create an ambiguity; rather, the ambiguity must be patent, i.e., apparent on the face of the contract." *Covington*, 784 N.E.2d at 190. In determining whether contractual language is ambiguous, the contract "must be construed as a whole," *Tri-State Group, Inc. v. Ohio Edison Co.*, 782 N.E.2d 1240, 1246 (Ohio Ct. App. 2002) (quoting *Equitable Life Ins. Co. of Iowa v. Gerwick*, 197 N.E. 923, 926 (Ohio Ct. App. 1934)), so as "to give reasonable effect to every provision in the agreement." *Stone v. Nat'l City Bank*, 665 N.E.2d 746, 752 (Ohio Ct. App. 1995); *see also Burris v. Grange Mut. Co.*, 545 N.E.2d 83, 88 (Ohio 1989) ("The meaning of a contract is to be gathered from a consideration of all its parts, and no provision is to be wholly disregarded as inconsistent with other provisions unless no other reasonable construction is

possible." (quoting *Karabin v. State Auto Mut. Ins. Co.*, 462 N.E.2d 403, 406 (Ohio 1984))). "[C]ommon words appearing in the written instrument are to be given their plain and ordinary meaning unless manifest absurdity results or unless some other meaning is clearly intended from the face or overall contents of the instrument." *Alexander*, 374 N.E.2d at 150.

If the language in the contract is ambiguous, the court should generally construe it against the drafter. *See Central Realty Co. v. Clutter*, 406 N.E.2d 515, 517 (Ohio 1980); *Mead Corp. v. ABB Power Generation, Inc.*, 319 F.3d 790, 798 (6th Cir. 2003) (applying Ohio law). In particular, "where the written contract is standardized and between parties of unequal bargaining power, an ambiguity in the writing will be interpreted strictly against the drafter and in favor of the non-drafting party." *Westfield*, 797 N.E.2d at 1261. However, this *contra proferentem* rule does not allow a court to adopt an unreasonable interpretation of the contract. *Id.* (citing *Morfoot v. Stake*, 190 N.E.2d 573, 574 (Ohio 1963)). Indeed, the purpose of the *contra proferentem* rule is to provide a means of determining which of two *reasonable* contractual interpretations should control. *See* Restatement (Second) of Contracts § 206 (1981) ("In choosing among the *reasonable meanings* of a promise or agreement or a term thereof, that meaning is generally preferred which operates against the party who supplies the words or from whom a writing otherwise proceeds." (emphasis added)).

If the contract is silent, as opposed to ambiguous, with respect to a particular matter, *see Statler Arms, Inc. v. APCOA, Inc.*, 700 N.E.2d 415, 421 (Ohio Ct. App. 1997) ("The fact that a contract . . . is silent on a particular point does not make it ambiguous."), "it is not the function of courts in Ohio to formulate a new contract for the parties." *Fultz & Thatcher v. Burrows Group Corp.*, No. CA2005-11-126, 2006 WL 3833971, at *6 (Ohio Ct. App. Dec. 28, 2006) (unpublished) (citing *Aultman Hosp. Ass'n v. Comm. Mut. Ins. Co.*, 544 N.E.2d 920, 924 (Ohio 1989)). Rather, "[t]he parties to a contract are required to use good faith to fill the gap of a silent contract." *Burlington Res. Oil & Gas Co. v. Cox*, 729 N.E.2d 398, 401 (Ohio Ct. App. 1999); *accord Myers v. Evergreen Land Dev. Ltd.*, No. 07 MA 123, 2008 WL 650774, at *5 (Ohio Ct. App. Mar. 6, 2008) (unpublished) ("An obligation of good faith generally arises only where a matter was not resolved explicitly by the parties. . . . [T]his duty is implied only under limited circumstances, such as when the contract is silent as to an issue. In such a case, the parties must use good faith in filling the gap."). "'Good faith' is a compact reference to an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties." *Ed Schory & Sons, Inc. v. Soc. Nat'l Bank*, 662 N.E.2d 1074, 1082-83 (Ohio 1996) (quoting *Kham & Nate's Shoes No 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1357-58 (7th Cir. 1990)). "What the duty of good faith consists of depends upon the language of the contract in each case which leads to an evaluation of reasonable expectations of the parties." *Fultz & Thatcher*, 2006 WL 3833971, at *6.

## 2. Interpretation of the Student Loan Contracts

At issue in the instant case is not whether the student loan contracts permit Access Group to collect the Additional Interest – the unpaid interest accrued as a result of interest rate changes during the first two years of repayment – but rather *when* and *how* Access Group may collect this Additional Interest under the terms of the student loan contracts.[8]

The district court found that the student loan contracts did not permit Access Group to collect Additional Interest from borrowers' monthly payments. *See Savedoff v. Access Group*, No. 1:06-CV-135, 2007 WL 649278, at *4-7 (N.D. Ohio Feb. 26, 2007). While the district court did not

---

[8] Both parties agree, as they must, that the Additional Interest is owed to Access Group under the student loan contracts which explicitly provide for increases in the interest rate based upon a change in the standard index, and require borrowers to pay "all the principal and interest and any other charges [owed] under this Promissory Note." J.A. at 105 (Paragraph E.2 of the Promissory Note).

consider the terms of the student loan contracts to be ambiguous, it found them "silent regarding whether the Access Group may utilize borrowers' monthly payments to pay off Additional Interest." *Id*. at \*6.  The district court then interpreted this silence as an expression of the parties' intent not to permit Access Group to collect Additional Interest from borrowers' monthly payments.  *See id*. at \*7.  The district court further decided to construe the contracts against Access Group, their drafter, and accordingly adopted Savedoff's proposed interpretation which permits Access Group to collect Additional Interest only as part of a "balloon payment" made in connection with a borrower's final monthly payment at the end of the twenty year repayment period.  *See id*. at \*4-6.

Access Group argues that the district court erred in interpreting the student loan contracts this way.  First, Access Group claims that the district court was not permitted to use the *contra proferentem* rule to adopt Savedoff's "balloon payment" interpretation of the contracts because Savedoff's interpretation is not a plausible reading of the parties' intent as expressed through the contractual language.  In particular, Access Group contends that paragraph E.4 of the contracts, which Savedoff relies upon for her "balloon payment" interpretation, does not limit Access Group to collecting the Additional Interest only with the borrower's final monthly payment at the end of the repayment term.  Second, Access Group claims that nothing in the contracts prohibits Access Group from collecting the Additional Interest from borrowers' monthly payments.  Rather, Access Group contends that the language of paragraph E.2 impliedly authorizes Access Group to apply borrowers' monthly payments to reduce the amount of Additional Interest owed to Access Group. *See id*. at 22.  Alternatively, Access Group maintains that, to the extent that the student loan contracts are silent as to when Access Group may collect the Additional Interest, the borrowers' general obligation under paragraph A to "pay to [Access Group's] order" all sums due means that the Additional Interest is payable on Access Group's demand or within a reasonable time, which would include collection either through monthly payments or through separate bills.[9]

In response, Savedoff first contends that the district court properly found that the clear and unambiguous terms of the student loan contracts prevent Access Group from collecting Additional Interest from borrowers' monthly payments.  Savedoff relies on paragraph E.3 of the contracts, which Savedoff claims does not expressly authorize Access Group to apply funds received for loan amortization to other charges such as Additional Interest.  To support such a reading of the contracts, Savedoff contrasts the terms of the private student loan contracts at issue in this case with the terms of Access Group's federal student loan contracts which expressly allow monthly payments to be applied to collection costs before they are applied to reduce the loan principal.  Savedoff then argues that paragraph E.4 expressly limits Access Group's collection of Additional Interest to the borrower's final monthly payment made at the end of the repayment term.  Finally, Savedoff contends that, to the extent the Court finds an ambiguity in the contracts regarding the collection of Additional Interest, this ambiguity must be construed against Access Group and in favor of Savedoff.

On *de novo* review of the student loan contracts, we agree with Access Group that the district court erred in adopting Savedoff's interpretation of the contracts.  We find that the plain language of the contracts, which is presumed to express the intent of the parties under Ohio law, *see Graham*,

---

[9]Savedoff argues that Access Group is not permitted to assert these alternative arguments on appeal because it failed to raise them in the district court. We find Savedoff's contention in this regard to lack merit.  While "the failure to present an issue to the district court forfeits the right to have the argument addressed on appeal," *Armstrong v. City of Melvindale*, 432 F.3d 695, 700 (6th Cir. 2006), the record in the instant case clearly demonstrates that Access Group raised with the district court all of the arguments which it has presented on appeal.  *See* J.A. at 266 (Defendant's Opposition to Plaintiff's Cross-Motion for Summary Judgment) ("Since the Additional Interest debt has already accrued, Access Group may require it to be paid at any time in its discretion."); *id*. at 267 ("[I]f plaintiffs prevail on the 'principal first' argument, Access Group may continue to charge the Additional Interest, late interest and late fees currently as long as it is charged on top of the amortized principal and interest payment.").

667 N.E.2d at 952, cannot plausibly be understood as limiting Access Group's collection of the Additional Interest to a borrower's final monthly payment at the end of the loan term. Similarly, we do not read the contractual language as prohibiting Access Group from collecting Additional Interest from borrowers' regular monthly payments. However, we also agree with Savedoff that the contracts do not expressly authorize Access Group to apply borrowers' monthly payments to the Additional Interest before applying them to reduce the principal balance of the loans. In short, we find that, rather than being ambiguous about the method and timing of Access Group's collection of the Additional Interest, the student loan contracts at issue are simply silent as to these matters. *See Statler Arms, Inc.*, 700 N.E.2d at 421 ("The fact that a contract . . . is silent on a particular point does not make it ambiguous."). Accordingly, we find that neither party is entitled to summary judgment and we remand the case to the district court for trial so that the fact-finder can consider whether Access Group acted in good faith as required by Ohio law.

As the district court correctly noted, the student loan contracts do not directly address the issue of *when* Access Group may collect the Additional Interest that accrued as a result of interest rate changes during the first two years of repayment. That Access Group has a right to collect this Additional Interest is clear from the borrower's general promise in paragraph A "to pay to [Access Group's] order . . . all of the principal sum [and] interest on such principal sum." J.A. at 105 (Paragraph A of the Promissory Note). However, the contracts do not specify when the Additional Interest is due. Instead, the parties rely on differing interpretations of the contracts' repayment provisions to support their contentions regarding when this Additional Interest may be collected. While the fact that the parties interpret the student loan contracts differently on this issue may suggest that the contracts are ambiguous, an ambiguity may only be found (and, thus, the *contra proferentem* rule may only be applied) if these differing interpretations are both *reasonable* ones. *See Covington*, 784 N.E.2d at 190 (indicating that a contract is ambiguous "where the language is susceptible of two or more reasonable interpretations").

Savedoff's interpretation of the student loan contracts as only permitting Access Group to collect Additional Interest in the final monthly payment is not a plausible reading of the contracts. Savedoff bases her "balloon payment" interpretation of the contracts on paragraph E.4. However, a careful reading of this paragraph indicates that it does not refer to the "Additional Interest" at issue in the present case, *i.e.*, the unpaid interest which accrued due to interest rate changes during the first two years of the borrower's repayment period. Paragraph E.4 provides:

> Amounts Owing at the End of the Repayment Period – Since interest accrues daily upon the unpaid balance of my loan, if I make payments after my payment due dates, I may owe additional interest. If I have not paid my late charges, I will also owe additional amounts for those late charges. In such case you will increase the amount of my final monthly payment to the amount necessary to repay my loan in full.

J.A. at 106. The first sentence of this paragraph refers to additional interest which accrues on late monthly payments, not interest which accrues as a result of interest rate changes. The second sentence refers to the late charges associated with these late monthly payments. The final sentence provides that these late payments and the interest due on them must be paid no later than the final monthly payment. Contrary to Savedoff's contention, this paragraph does not address the issue of when "Additional Interest" may be collected by Access Group, let alone direct that it must be paid only in one lump sum at the end of the repayment period. Indeed, paragraph E.4 does not even limit the collection of late payments and the interest due on them to the final monthly payment. Rather the language suggests that these late payments will be collected in the final monthly payment only if the borrower has not already paid them.

Savedoff's interpretation of the contracts appears even more unreasonable in light of paragraph E.2. Paragraph E.2 provides:

> Repayment Period – During the Repayment Period you will send me periodic statements on my loan. The periodic statements will cover periods beginning on the first day of the Repayment Period and on the same day each following month. I will make consecutive monthly payments in the amounts and on the payment due dates shown on my periodic statements *until* I have paid all the principal and interest and any other charges I may owe under this Promissory Note.

J.A. at 106 (emphasis added). This language describes a continuing process of paying off the "principal and interest and any other charges" owed by the borrower. *Id.* Rather than prohibiting the collection of Additional Interest from a borrower's monthly payments, the structure of the final sentence suggests that each monthly payment will be used to repay not only principal and interest, but also "any other charges [the borrower] may owe under [the] Promissory Note." *Id.* This paragraph may reasonably be read to support Access Group's interpretation that collecting Additional Interest from monthly payments is permitted by the contracts. However, this paragraph cannot reasonably be read as consistent with Savedoff's contention that collection of Additional Interest from monthly payments is prohibited by the contracts.

Because Savedoff's interpretation of the contracts is not a reasonable one, it does not create an ambiguity in the contracts which would justify applying the *contra proferentem* interpretation principle. Yet, just because we may not apply the *contra proferentem* rule to adopt Savedoff's unreasonable interpretation of the contracts does not mean that we must adopt Access Group's interpretation of the contracts. Rather, our task is to ascertain the intent of the parties as expressed through the contracts' plain language. *See Graham*, 667 N.E.2d at 952.

The contractual provision which most directly addresses the issue of monthly payments is paragraph E.3. The paragraph provides:

> Repayment Terms – The amounts shown on my periodic statements will be consecutive monthly installments of the principal and interest calculated each Change Date to equal the amount necessary to amortize the unpaid principal balance (including any capitalized interest) of my loan (as of the date of calculation) in equal monthly installments of principal and interest at the Variable Rate then in effect over the number of months remaining in the Repayment Period.

J.A. at 106. This language suggests that the monthly payments should only be applied to reduce interest and the unpaid principal balance. As Savedoff correctly notes, this language does not expressly authorize the application of monthly payments to other charges such as late fees. However, the Additional Interest at issue here is not a late fee or other such charge, but rather interest which has properly accrued during the first two years of repayment and has not yet been paid. At the same time, it is not clear that the Additional Interest in this case is the same as the "interest" to which monthly payments may be applied under paragraph E.3. On the contrary, the "interest" which is part of each monthly payment is most naturally understood as the interest that must be paid by the borrower to ensure that amortization of the principal balance will occur over the number of months remaining in the repayment period. The language of paragraph E.3 does not indicate whether Additional Interest is part of this calculation and thus provides no indication of whether Additional Interest may be collected through these monthly payments. Indeed, paragraph E.3 does not appear to even contemplate the possibility of Additional Interest. The paragraph seems to presume that repayment is occurring under the Easy Pay Equal plan whereby all monthly payments are amortized to include both interest and principal. The language does not provide any guidance with respect to how Additional Interest – interest which has accrued but not been paid during the first two years of an Easy Pay 2 Step or Easy Pay 3 Step repayment schedule – should be treated when seeking to amortize the unpaid principal balance during the remainder of the repayment term. In short, the paragraph neither authorizes nor prohibits Access Group's collection

of Additional Interest from borrowers' monthly payments. The contractual language simply does not address the issues of *how* and *when* Access Group may collect Additional Interest.[10] Thus, this is not a case where the contractual language is ambiguous, but rather a situation where the contractual language is silent.

Unlike the district court, however, we do not read any intent into the parties' contractual silence with regard to the method and timing of Access Group's collection of Additional Interest. Indeed, Ohio law prohibits a court from creating a contract for the parties when their contract has failed to address a particular matter. *See, e.g.*, *Statler Arms*, 700 N.E.2d at 421 ("In construing contracts, courts should not under the guise of doing substantial justice, ignore the agreement of the parties by making a contract of its own."); *Alexander*, 374 N.E.2d at150. Rather, "[t]he parties to a contract are required to use good faith to fill the gap of a silent contract." *Burlington*, 729 N.E.2d at 401. Accordingly, the issue of whether Access Group breached the student loan contracts in this case turns on the question of whether Access Group acted in good faith when applying borrowers' monthly payments to reduce the amount of Additional Interest owed before applying such payments to amortize the principal.

Because this "good faith" question appears to present a mixed-issue of law and fact which should not be resolved by this Court, but rather by a trier of fact, we remand this case to the district court with the following guidance. In the context of contractual silence, the Ohio courts have explained that "good faith" refers to "an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties." *Ed Schory & Sons,* 662 N.E.2d at 1082-83 (quoting *Kham*, 908 F.2d at 1357-58). Thus, in determining whether Access Group either acted or failed to act in such a manner when collecting Additional Interest from borrowers' monthly payments, the fact-finder should consider the "reasonable expectations of the parties." *Fultz & Thatcher*, 2006 WL 3833971, at *6. To enable a jury to make this determination, the parties will likely need to present evidence which is not currently in the record. For example, the parties may wish to present evidence regarding whether Access Group provided advance notice to borrowers that it would collect Additional Interest from borrowers through their monthly payments. Likewise, evidence (or the lack thereof) of contract modification proposals concerning the collection of Additional Interest, if presented to borrowers by Access Group, might also be relevant. Finally, a jury may need to consider the motivations of Access Group for deciding to collect Additional Interest from borrowers' monthly payments as opposed to other possible methods of collection. The ultimate inquiry, however, must focus on whether Access Group acted in good faith by filling in the contractual gap with an unstated provision allowing for the collection of Additional Interest directly from borrowers' monthly payments.

### III. CONCLUSION

For the foregoing reasons, the judgment of the district court is **AFFIRMED** in part and **REVERSED** in part. The district court's grant of summary judgment to Savedoff on her first breach of contract claim and its denial of summary judgment to Access Group on Savedoff's second breach of contract claim are **AFFIRMED**. However, the district court's grant of summary judgment to Savedoff on her second breach of contract claim and the portions of the district court's injunctive

---

[10]Access Group's contention that this issue is addressed in paragraph A of the contract is without merit. Paragraph A contains the borrower's general promise "to pay to your [Access Group's] order *on the terms of this Promissory Note* all of the principal sum [and all] interest on such principal sum." J.A. at 105 (emphasis added). This promise, by its own terms, is not a promise to render payment upon Access Group's demand, but rather a promise to render payment in accordance with "the terms of this Promissory Note." *Id*. Thus, rather than resolving the issue, paragraph A merely seems to raise the question of *when* and *how* Access Group may collect the Additional Interest *under the terms of the Promissory Note*.

order providing a remedy to Savedoff for this second claim are **REVERSED**. Finally, the case is **REMANDED** to the district court with instructions to permit a trier of fact to determine, in a manner consistent with this opinion, whether Access Group acted in good faith when proceeding to collect Additional Interest from borrowers through their monthly payments.

---
**CONCURRENCE**
---

　　RONALD LEE GILMAN, Circuit Judge, concurring. I concur in the result reached by the lead opinion, but write separately simply to clarify that any additional evidence that may be developed with respect to whether Access Group acted in good faith when applying the borrowers' monthly payments to reduce the amount of Additional Interest will not necessarily need to be submitted to a jury. Although language in the lead opinion implies that a jury will make such a determination, the parties may in fact wish to file additional motions for summary judgment once evidence bearing on the issue of Access Group's good-faith dealing—or lack thereof—is in the record. At that point, the district court will be in a position to decide whether a genuine issue of material fact exists on the question or whether the case can be disposed of as a matter of law.