NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 15a0401n.06

Case No. 14-2099

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Jun 04, 2015
DEBORAH S. HUNT, Clerk

ROYAL MANOR APARTMENTS, LLC,                )
                                            )
        Plaintiff-Appellee,                 )
                                            )        ON APPEAL FROM THE
v.                                          )        UNITED STATES DISTRICT
                                            )        COURT FOR THE EASTERN
FEDERAL NATIONAL MORTGAGE                   )        DISTRICT OF MICHIGAN
ASSOCIATION,                                )
                                            )        **OPINION**
        Defendant-Appellant.                )

BEFORE: DAUGHTREY, GIBBONS, and GRIFFIN, Circuit Judges.

JULIA SMITH GIBBONS, Circuit Judge. This is a contractual dispute over the amount paid by Royal Manor Apartments, LLC ("Royal Manor") when it redeemed a property on which the Federal National Mortgage Association ("Fannie Mae") had foreclosed. Arguing that it had been forced to pay too much to redeem the property, Royal Manor sued Fannie Mae to recover the alleged overpayment. The district court granted summary judgment to Royal Manor, finding that (1) a contractual 5% late fee on the balloon payment was unenforceable, (2) Fannie Mae had wrongly applied certain post-foreclosure payments to attorneys' fees, and (3) Fannie Mae had used a too-high interest rate during the time frame between foreclosure and redemption. As explained below, we affirm in part and reverse in part the district court's judgment and remand for further proceedings.

I.

In 2003, Royal Manor borrowed money to purchase an apartment complex in Oakland County, Michigan. As part of that transaction, Royal Manor executed a note agreeing to pay $2,000,000 to Arbor Commercial Mortgage, LLC, and granted Arbor a mortgage on the property. Shortly thereafter, Arbor assigned the mortgage and note to Fannie Mae. The note called for Royal Manor to make monthly payments of $11,658.75, consisting of interest and principal, starting on April 1, 2003 and continuing until Royal Manor made a balloon payment of all remaining interest and principal on March 1, 2013. Over the next ten years, Royal Manor made all of its monthly payments on time, but when the balloon payment came due, it defaulted. The outstanding principal balance on March 1, 2013 was $1,687,701.78.

On March 11, 2013, Fannie Mae demanded full payment of the outstanding principal balance and accrued interest, as well as its costs and attorneys' fees. In a separate letter sent the same day, Fannie Mae expressed its willingness to discuss potential restructuring plans for the loan, provided that Royal Manor executed a pre-negotiation agreement consenting to certain conditions. In the pre-negotiation agreement, which Royal Manor signed on March 21, 2013, Royal Manor acknowledged that the loan had matured and was fully due, that Royal Manor had defaulted, and that Fannie Mae retained its rights and remedies set forth in the loan documents. Royal Manor further agreed to make monthly payments to Fannie Mae of either (a) the pre-maturity monthly payment due under the loan documents, or (b) all of the net operating income ("NOI") from the property. And Royal Manor agreed that those payments could be used by Fannie Mae "in any order and for any purpose which is related directly or indirectly to the Loan Documents or to the Property, including, without limitation, the payment of attorneys' fees . . . ."

The parties did not reach a permanent agreement on restructuring the loan. On June 6, 2013, Fannie Mae filed a complaint in the Eastern District of Michigan requesting the court to issue a preliminary injunction against Royal Manor and to appoint a receiver.

On July 9, 2013, Fannie Mae purchased the property by credit bid at a foreclosure sale for $1,740,860.42. Fannie Mae calculated the amount it was owed as follows. The starting point was the principal balance owed as of March 1, 2013 ($1,687,701.78). Fannie Mae then added interest at the annual rate of 5.74%, the baseline rate established in the note ($42,516.96). Fannie Mae then charged additional interest at the annual rate of 4% that was due upon default, as provided in the note ($24,377.91). Also as provided in the note, Fannie Mae assessed a 5% late fee on the principal balance ($84,761.82).[1] Fannie Mae added another $10,075.00 of costs, which included an appraisal, a broker's price opinion, an environmental site assessment, and a physical need assessment, but did not include attorneys' fees other than the $75.00 statutory fee under MCL 600.2431(2)(c). Finally, Fannie Mae subtracted $108,573.05 in escrow and reserve funds that it was holding.

After the foreclosure sale, Royal Manor made two additional NOI payments to Fannie Mae totaling $29,219.84.

On August 15, 2013, Royal Manor redeemed the property by paying $1,758,527.22.[2] This amount represented the amount of Fannie Mae's credit bid at the foreclosure sale ($1,740,860.42), plus interest at the annual rate of 9.74% from the date of the foreclosure sale to the date of redemption.

---

[1] It is unclear to us where this figure came from. 5% of $1,687,701.78 is $84,385.09. Nevertheless, the parties seem to have accepted the figure of $84,761.82.

[2] Fannie Mae says that according to its records, the redemption price was $1,758,513.22, but acknowledges that the $14 discrepancy is not material.

Shortly thereafter, Royal Manor filed a counterclaim against Fannie Mae alleging that the amount Royal Manor had paid to redeem the property exceeded the amount it owed to Fannie Mae. First, Royal Manor argued that the terms of the loan documents did not allow Fannie Mae to assess a 5% late charge against the entire outstanding principal and interest balance at maturity, and that even if the contract did include such a provision, it would be an unenforceable penalty. Second, Royal Manor argued that Fannie Mae wrongly applied the post-default interest rate of 9.74%, rather than the contractual baseline interest rate of 5.74%, for the period after the foreclosure sale until redemption. Finally, Royal Manor argued that Fannie Mae wrongly applied its post-foreclosure NOI payments to Fannie Mae's attorneys' fees rather than crediting those payments toward the amount Royal Manor would have to pay in redemption.

Fannie Mae moved to dismiss; Royal Manor moved for summary judgment. The district court denied Fannie Mae's motion to dismiss and granted summary judgment to Royal Manor. First, the district court found that the 5% late charge provision in the note did apply to the balloon payment, but that it was unreasonable and therefore constituted a penalty and was unenforceable. Second, the district court further held that Royal Manor's post-foreclosure NOI payments were improperly applied to Fannie Mae's attorneys' fees. Finally, the district court held that Royal Manor was improperly charged a 9.74% interest rate, rather than 5.74%, during the period between foreclosure and redemption, and that (consistent with the first two holdings) the too-high interest rate was applied to an too-large amount of principal—*i.e.*, it was applied to an amount that added the 5% late charge and that did not subtract Royal Manor's post-foreclosure NOI payments.

Fannie Mae timely filed this appeal, seeking reversal of all three of these rulings and renewing its motion to dismiss. Citing the costs of litigation, Royal Manor declined to file a

reply brief but instead submitted a letter stating that it would rely solely on the briefing filed in the district court and the district court's order granting summary judgment.[3]

## II.

We review *de novo* a district court's grant of summary judgment. *Rose v. State Farm Fire & Cas. Co.*, 766 F.3d 532, 535 (6th Cir. 2014). Summary judgment is appropriate if the record, viewed in the light most favorable to the nonmoving party, "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

In making this assessment we apply Michigan substantive law. This is because in a diversity case the court applies the choice-of-law rules of the forum state: here, Michigan. *Mill's Pride, Inc. v. Continental Ins. Co.*, 300 F.3d 701, 704 (6th Cir. 2002) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). And under Michigan choice-of-law rules we will give effect to the parties' choice-of-law clause, which states that the applicable law will be the law of the jurisdiction where the land is located: again, Michigan. *See Chrysler Corp. v. Skyline Indus. Servs., Inc.*, 528 N.W.2d 698, 703–707 (Mich. 1995).

## III.

We first consider whether the contractual 5% late charge provision was enforceable on the balloon payment. At the outset we note briefly that the district court was correct to find that

---

[3] Although this is an unorthodox move, it is contemplated by the Federal Rules of Appellate Procedure. If an appellant fails to file a brief, an appellee may move to dismiss the appeal, but if, as here, an appellee fails to file a brief, the penalty is simply that the appellee "will not be heard at oral argument unless the court grants permission." Fed. R. App. P. 31(c). Having different penalties makes sense: "A district court's judgments are not chattels that the victors may abandon at their pleasure but precedents with value 'to the legal community as a whole.'" *Lampe v. Kash*, 735 F.3d 942, 943 (6th Cir. 2013) (quoting *U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 26 (1994)).

by the plain language of the note, the late charge provision did apply to the balloon payment.

The late charge provision reads as follows:

> If any monthly installment due hereunder is not received by Lender on or before the 10th day of each month or if any other amount payable under this Note or under the Security Instrument or any other Loan Document is not received by Lender within 10 days after the date such amount is due, counting from and including the date such amount is due, Borrower shall pay to Lender, immediately and without demand by Lender, a late charge equal to 5 percent of such monthly installment or other amount due.

As the district court correctly observed, the only amounts payable under the note are installment payments and the balloon payment at maturity, so the words "other amount payable under this Note" would be superfluous if they did not include the balloon payment. "[C]ourts must . . . give effect to every word, phrase, and clause in a contract and avoid an interpretation that would render any part of the contract surplusage or nugatory." *Klapp v. United Ins. Group Agency, Inc.*, 663 N.W.2d 447, 468 (Mich. 2003).

The pivotal question, then, is whether the late fee provision was enforceable, which, as discussed above, turns on Michigan law. "In resolving issues of Michigan law, we look to the final decisions of that state's highest court, and if there is no decision directly on point, then we must make an *Erie* guess to determine how that court, if presented with the issue, would resolve it." *Conlin v. Mortgage Electronic Registration Systems, Inc.*, 714 F.3d 355, 358–59 (6th Cir. 2013) (citing *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 762 (6th Cir. 2008)). "In making this determination, '[i]ntermediate state appellate courts' decisions are also viewed as persuasive unless it is shown that the state's highest court would decide the issue differently.'" *Id.* (alteration in original) (quoting *Savedoff*, 524 F.3d at 762)).

The Michigan Supreme Court has not addressed whether a contractual late fee on a balloon payment is enforceable. Other jurisdictions are split. *Compare 1300 Ave. P Realty Corp. v. Stratigakis*, 720 N.Y.S.2d 725, 726–27 (N.Y. App. Term. 2000) (late fee provision

clearly applied to the balloon payment and was enforceable), *and MetLife Capital Fin. Corp. v. Washington Ave. Assocs. L.P.*, 732 A.2d 493, 495 (N.J. 1999) (five percent late fee on balloon payment was a valid measure of liquidated damages), *with Poseidon Dev., Inc. v. Woodland Lane Estates, LLC*, 62 Cal. Rptr. 3d 59, 65–66 (Cal. Ct. App. 2007) (late fee on balloon payment would be an unenforceable penalty), *and In re Market Ctr. East Retail Prop., Inc.*, 433 B.R. 335, 363 (Bankr. D.N.M. 2010) (five percent late fee on principal balance was an unenforceable penalty under the court's best guess at New Mexico law).

Fortunately, however, the Michigan Court of Appeals has spoken on the issue, albeit in an unpublished opinion. *P & R Developers, L.L.C. v. Scott T. Bosgraaf Trust U/A/D 2/25/88 ex rel. Bosgraaf*, No. 297439, 2011 WL 6119288 (Mich. Ct. App. Dec. 8, 2011). In *Bosgraaf* the parties entered into a land contract under which the defendants would purchase property containing eight condominium units for $1,350,000, payable in three yearly installments of at least $150,000 and a final balloon payment of the balance. *Id.* at *1. The contract provided for a five percent late fee on the balloon payment. *Id.* at *5. The defendants defaulted on the balloon payment of $850,000. *Id.* The trial court awarded plaintiffs a five percent late fee of $42,500, and the Michigan Court of Appeals, treating the late fee as a liquidated damages provision, affirmed:

> It is a well-settled rule in this State that the parties to a contract can agree and stipulate in advance as to the amount to be paid in compensation for loss or injury which may result in the event of a breach of the agreement. Such a stipulation is enforceable, particularly where the damages which would result from a breach are uncertain and difficult to ascertain at [the] time [the] contract is executed. If the amount stipulated is reasonable with relation to the possible injury suffered, the courts will sustain such a stipulation.

*Id.* (alteration in original) (quoting *Moore v. St. Clair Co.*, 328 N.W.2d 47 (Mich. Ct. App. 1982)). The Michigan Court of Appeals concluded that at the time of contracting, the potential

damages if defendants failed to make the balloon payment were uncertain and difficult to ascertain, and further concluded that the five percent late fee was reasonable. *Id.*

*Bosgraaf* is closely analogous and we will follow it in making our *Erie* best guess as to what Michigan law requires in this case. Although *Bosgraaf*, as an unpublished opinion of the Michigan Court of Appeals, is not precedentially binding, *see* MCR 7.215(C)(1), it is persuasive and there is no indication that the Michigan Supreme Court would decide the issue differently: indeed, the Michigan Supreme Court denied Bosgraaf's application for leave to appeal the judgment of the Michigan Court of Appeals. *P & R Developers, L.L.C. v. Scott T. Bosgraaf Trust U/A/D 2/25/88 ex rel. Bosgraaf*, 815 N.W.2d 457 (Mich. 2012) (mem.).

As Fannie Mae points out, the cases cited by the district court are inapposite. Both *Green v. Trowbridge 1, Inc.*, No. 230349, 2003 WL 21508489, at *2–3 (Mich. Ct. App. July 1, 2003), and *In re Brunswick Apartments of Trumbull County, Ltd.*, 169 F.3d 333, 335 (6th Cir. 1999), addressed the preliminary question of whether the language of the contract allowed the lender to charge a late fee on the balloon payment in the first place, not whether that contractual language was enforceable—the issue presented here. *See In re Brunswick Apartments*, 169 F.3d at 335 ("It is obvious that the note contemplates a service charge only on unpaid monthly installments. There is no ambiguity in the language of the note."); *Green v. Trowbridge 1, Inc.*, 2003 WL 21508489, at *2 ("We reject defendant's argument that the balloon payment is 'merely one of many' installment payments, thereby warranting a five percent late fee.").

It is worth acknowledging that *In re Brunswick Apartments* does contain dicta suggesting that a contractual late charge on a balloon payment may be unenforceable in certain circumstances:

> The courts below observed that "standard commercial practice" imposes service
> charges for nonpayment of periodic installments, not on the principal balance

owed at maturity. That holding is consistent with the case law developed under § 506(b) of the Bankruptcy Code, which applies the principle that a service charge based on percentage of the remaining balance is unreasonable when combined with default interest greater than the market rate of interest.

*Id.* (citing *In Re Consolidated Props., Ltd. P'ship*, 152 B.R. 452 (Bankr. D. Md. 1993)). But that commentary does not control this case. For one thing, the court's observations about "standard commercial practice" made by the "courts below" are perhaps outdated but at least are called into question by the number of cases in various jurisdictions addressing (and upholding) contractual late-fee-on-balloon-payment provisions, as discussed above. For another, the observations about "standard commercial practice" are presented in the context of discussing whether the contract is ambiguous about whether the late charge was meant to apply the balloon payment in the first place. Moreover, this case does not involve the Bankruptcy Code. And there is a Michigan case addressing this question but going the other way.

In light of that case—*Bosgraaf*—we reverse the district court's decision to grant summary judgment to Royal Manor on the basis that the late charge provision was unenforceable. Under Michigan law, as best we can ascertain, Fannie Mae was contractually entitled to apply the late charge provision to the balloon payment. We therefore remand to the district court with instructions to grant Fannie Mae's motion to dismiss on this claim: as a matter of law, Royal Manor is not entitled to legal relief even if its factual allegations are true. *See* Fed. R. Civ. P. 12(b)(6); *Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir. 1993).

IV.

We next consider whether Fannie Mae was entitled to apply Royal Manor's post-foreclosure NOI payments to attorneys' fees. In the pre-negotiation agreement, Royal Manor agreed to make monthly payments to Fannie Mae of either (a) the pre-maturity monthly payment

due under the loan documents, or (b) all of the net operating income ("NOI") from the property.

And Royal Manor agreed that those payments could be used by Fannie Mae

> in any order and for any purpose which is related directly or indirectly to the Loan Documents or to the Property, including, without limitation, the payment of attorneys' fees or other charges incurred by Fannie Mae, application to principal or interest due under the note evidencing the Loan, payment for repairs or capital expenditures for the Property, or any other purpose determined by Fannie Mae in its sole and absolute discretion and in accordance with the Loan Documents.

After the foreclosure sale, Royal Manor made two additional NOI payments to Fannie Mae totaling $29,219.84. Fannie Mae acknowledges that it applied these payments to its attorneys' fees and says that it was entitled to do so under the terms of the pre-negotiation agreement.

In its motion for summary judgment, Royal Manor argued that the NOI payments "should have been credited by Fannie Mae to Royal Manor in the calculation of the redemption price." Royal Manor further argued that even if Fannie Mae was entitled to apply the payments to attorneys' fees, the amount of claimed attorneys' fees was unreasonable. The district court sided with Royal Manor on the first question, finding that Fannie Mae was not allowed to apply the NOI payments to attorneys' fees. The district court noted, in part, that the "NOI payments were made after the sale, and by then, the Pre-Negotiation Agreement was not the controlling document; Michigan's foreclosure statute then controlled."

The district court was right insofar as the pre-negotiation agreement did not by its own terms control after foreclosure. After foreclosure the debt is satisfied and the mortgage is extinguished. *Bank of Three Oaks v. Lakefront Properties*, 444 N.W.2d 217, 219 (Mich. Ct. App. 1989). The purpose of the pre-negotiation agreement was "to discuss the problems associated with this Loan and a potential workout/restructuring plan for the Loan." But after foreclosure there was nothing to negotiate. Although the pre-negotiation agreement expressly allowed Fannie Mae to pursue the remedies allowed under the loan documents, including

foreclosure, even while discussing with Royal Manor the possible terms of restructuring, the pre-negotiation agreement did not say—indeed, it would make little sense for it to have said—that if Fannie Mae *did* pursue those remedies, it would still be entitled to the benefit of the pre-negotiation agreement, including continuing to receive NOI payments. Either party was entitled to terminate the pre-negotiation agreement at any time for any reason, and we conclude that the fairest reading is that Fannie Mae did so by foreclosing.

The difficulty for Royal Manor is the following admission contained in its motion for summary judgment: "Following the foreclosure sale and a telephonic status conference relating to Fannie Mae's Motion for Appointment of a Receiver, Royal Manor agreed to continue making NOI payments to Fannie Mae per the terms of the Pre-Negotiation Agreement." (DE 20, Mot. Summ. J., Page ID 524.) In other words, after foreclosure, Royal Manor entered into a fresh agreement that incorporated the terms of the pre-negotiation agreement as they related to NOI payments. Thus, even if the pre-negotiation agreement had been terminated, Royal Manor has conceded that the payment terms continued to apply.

Furthermore, Royal Manor has forfeited any argument to the contrary by its repeated explicit acknowledgments that the NOI payments were made under the terms of the pre-negotiation agreement. For example:

- "Fannie Mae also failed to credit Royal Manor for payments made under the Pre-Negotiation Agreement following the foreclosure sale. Specifically, Royal Manor made payments of $29,219.84, which should have been credited by Fannie Mae to Royal Manor in the calculation of the redemption price." (DE 15, Def.'s First Am. Verified Answer, Page ID 412.)

- "Fannie Mae failed to credit Royal Manor for payments made under the Pre-Negotiation Agreement following the foreclosure sale." (DE 20, Mot. Summ. J., Page ID 548.)

- "It is undisputed that Royal Manor made payments of $29,219.84 after the foreclosure sale, pursuant to the terms of the Pre-Negotiation Agreement, which Fannie Mae failed to credit Royal Manor for in calculating the redemption amount." (DE 22, Response to Mot. to Dismiss, Page ID 919.)

And the terms of the pre-negotiation agreement, *supra*, are clear: Fannie Mae was allowed at its sole discretion to use the NOI payments for any purpose related to the loan or the property, including attorneys' fees.

We therefore reverse the district court's judgment that Fannie Mae was not entitled to apply the NOI payments to attorneys' fees. Because this does not resolve Royal Manor's other argument to the district court—that the claimed attorneys' fees were unreasonable—we remand for consideration of that question.

V.

Finally, we consider what the applicable interest rate was between foreclosure and redemption. The district court held that it was 5.74%. Michigan law provides that a mortgagor may redeem a foreclosed property by paying

> the amount that was bid for the entire premises sold, *interest from the date of the sale at the interest rate provided for by the mortgage*, the amount of the sheriff's fee paid by the purchaser under section 2558(2)(q), and an additional $5.00 as a fee for the care and custody of the redemption money if the payment is made to the register of deeds.

MCL § 600.3240(2) (emphasis added). Although Royal Manor's mortgage does not specify an interest rate, it incorporates the note by reference. The note, in turn, specifies that interest would ordinarily accrue on the unpaid principal balance at the annual rate of 5.74%, but if Royal Manor defaulted (*i.e.*, "[s]o long as any monthly installment or any other payment due under this Note

remains past due for 30 days or more"), the interest rate would increase by four percentage points to 9.74%.

Royal Manor argued below that because the mortgage ceased to exist upon the foreclosure sale, the default interest provision no longer applied, and therefore for purposes of MCL 600.3240(2) the "interest rate provided for by the mortgage" was the baseline rate of 5.74%. Fannie Mae contends that the default interest rate of 9.74% is the "interest rate provided for by the mortgage," because at the moment when the foreclosure sale occurred, Royal Manor was in default and the higher interest rate applied.

Royal Manor has the better of this argument. "When property is purchased at a foreclosure sale for an amount equal to the amount due on the mortgage, the debt is satisfied" and the mortgage is extinguished. *Lakefront Properties*, 444 N.W.2d at 219. Thus, upon foreclosure, no payments from Royal Manor to Fannie Mae remained past due; indeed, no payments were due at all. Under the terms of the note, the default interest rate of 9.74% applies only so long as payments remain past due for 30 days or more; otherwise, the rate of 5.74% applies. Therefore the "interest rate provided for by the mortgage" for purposes of MCL § 600.3240(2) should be the baseline rate of 5.74% as specified in the note.

We therefore affirm the district court's holding that the applicable post-foreclosure interest rate was 5.74%. However, because in light of the first two holdings this interest rate applies to a different balance than the district court thought, we remand for recalculation of the amount by which Royal Manor overpaid in post-foreclosure interest.

VI.

For the reasons set forth above we reverse the district court's grant of summary judgment to Royal Manor as to the first ruling and simultaneously remand with instructions to grant Fannie

Mae's motion to dismiss on that claim. Under Michigan law the late fee on the balloon payment was enforceable.

We further reverse the district court's grant of summary judgment to Royal Manor as to the second ruling. Fannie Mae was contractually entitled to apply the post-foreclosure payments to attorneys' fees. However, Royal Manor also argued in the district court that the amount of attorneys' fees was unreasonable, so we remand for further proceedings to resolve that issue.

Finally, we affirm the district court's grant of summary judgment to Royal Manor on the third finding: Fannie Mae did charge Royal Manor an overly-high interest rate during the period between foreclosure and redemption. However, in light of the above rulings, the amount on which post-foreclosure interest should have been charged is different than the district court thought. Therefore, even though the district court got the applicable interest rate right, we must remand to the district court to recalculate the amount by which Royal Manor overpaid in post-foreclosure interest.