NOT RECOMMENDED FOR PUBLICATION

File Name: 20a0499n.06

No. 19-2400

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

EFFYIS, INC., et al.,

    *Plaintiffs-Appellees*,

v.

DARREN KELLY,

    *Defendant-Appellant*.

)
)
)
)
)
)
)
)
)

FILED
Aug 25, 2020
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF
MICHIGAN

---

**Before: BATCHELDER, BUSH, and LARSEN, Circuit Judges.**

**ALICE M. BATCHELDER, Circuit Judge.** Effyis, Inc. and Hottolink, Inc. (collectively, the "Companies"), fired Darren Kelly, who argued that the Companies had breached the parties' employment agreement. After some settlement discussions aimed at resolving the dispute, the Companies sued Kelly, claiming that Kelly had agreed to a binding settlement agreement regarding the termination of his employment. Kelly counterclaimed for breach of the employment contract. The district court granted summary judgment to the Companies on the issue of the settlement agreement as well as on Kelly's counterclaim, finding that judgment on the settlement agreement foreclosed Kelly's breach of contract claim. Kelly appeals. Because there are genuine issues of material fact regarding the parties' intent to settle and the essential terms of the settlement, we **VACATE** the district court's order and **REMAND** for further proceedings consistent with this opinion.

1

# I.

Japan's Hottolink, Inc. acquired Michigan-based Effyis, Inc. in 2015. As part of the acquisition deal, Hottolink hired Effyis's former owners, Scott Purdon and Darren Kelly, as the CEO and President of Effyis, respectively, placing both men on the Companies' boards of directors. Kelly's employment agreement provided that he would serve as Effyis's president for four years, unless terminated for cause. As part of the acquisition, Hottolink also issued a promissory note to Kelly for $1,984,920 with a maturity date of January 2019.

## A. The Companies terminate Kelly's employment agreement in February 2017.

Two years after the acquisition, the Companies terminated Kelly's employment agreement. In a Notice of Termination, Koki Uchiyama—Hottolink's CEO and Effyis's Chairman—blamed Kelly for Effyis's weak financial performance. According to Uchiyama, Kelly's incompetence had impaired the financial position of the Companies. R. 1-4, PageID: 49. Uchiyama claimed that during Kelly's tenure as Effyis's President, Kelly had spent his time relaxing at various vacation destinations rather than providing competent leadership, and that despite Effyis's tenuous financial position, Kelly had refused to "engage in any meaningful discussion of a salary reduction." *Id.* at 50. Uchiyama also alleged that Kelly's failures had devalued Effyis

> to such an extent that [Kelly] and Scott Purdon proposed repurchasing Effyis from Hottolink at a price substantially lower than that which Hottolink paid less than two years ago, i.e., $15.1 Million, which represents a 33.2% reduction in valuation. This proposal was motivated by [Kelly's] own self-interest and would have further damaged Hottolink because of the impact on its financial statements.

*Id.*

Kelly retained counsel, contending that Uchiyama's allegations were false and that Hottolink had breached the employment agreement. The Companies entered into settlement negotiations, in which Purdon—Effyis's CEO—took part.

**B. Purdon and Kelly exchange emails on April 12, 2017.**

On April 12, 2017, Purdon and Kelly discussed the settlement over the phone. After their phone call, Purdon sent Kelly the following email:

> **From:** Scott Purdon[]
> **Sent:** Wednesday, April 12, 2017 12:53 PM
> **To:** [Darren Kelly]
> **Subject:** Confirmation
>
> DK,
>
> Thank you for all your participation and support during this very difficult situation!
>
> Please respond to this email with your confirmation (YES I CONFIRM). Once I have your confirmation, we can get the attorneys to finalize the necessary legal paperwork so that [Hottolink] can process your payments.
>
> 1)  Full Loan Repayment
>
> 2)  $15,000 USD Payment
>
> 3)  Signed waivers (US and Japan)
>
> Best,
>
> Scott

R. 36-2, PageID: 691.

Kelly replied to Purdon's email, copying his counsel—Daniel Villaire and Masaya Hirano—and a Hottolink board member—Keiko Yasuda—on the email exchange:

> **From:** Darren Kelly[]
> **Sent:** Wednesday, April 12, 2017 2:23 PM
> **To:** [Scott Purdon]
> **Cc:** [Keiko Yasuda]; [Daniel Villaire]; [Masaya Hirano]
> **Subject:** RE: Confirmation
>
> Yes, I confirm.
>
> I am doing this because I have the best interest of all stakeholders in mind.
>
> I continue to vigorously deny the allegations made against me and they must be retracted in the waiver documents.
>
> If this settlement is not completed in a timely basis, I will immediately take action in the courts to defend my rights.
>
> My Michigan and Japanese attorneys are copied.

Thank you, Scott, for your great assistance in this matter.

-DK

*Id.* at 690–91; R. 35-4, PageID: 600. Purdon then thanked Kelly for his email:

**From:** Scott Purdon[]
**To:** Darren Kelly[]
**cc:** [Keiko Yasuda], [Daniel Villaire], [Masaya Hirano]
**Date:** Wed, Apr 12, 2017, 4:53 PM
**Subject:** Re: Confirmation

Thank you DK! I'll pass along your confirmation so we move forward immediately.

R. 30-2, PageID: 421.

About ten minutes after Kelly responded to Purdon's email, Kelly emailed his attorneys and forwarded that email to Purdon with a message that said, "FYI":

**From:** Darren Kelly[]
**Sent:** 4/12/2017 8:32:58 PM
**To:** [Scott Purdon]
**Subject**: FW: Confirmation

FYI

**From:** Darren Kelly[]
**Sent:** Wednesday, April 12, 2017 2:32 PM
**To:** [Masaya Hirano]
**Cc:** [Daniel Villaire]
**Subject:** FW: Confirmation

Hello Masaya,

I hope you are well. A lot has happened since our last correspondence.

I attempted to resign from the Hottolink Board on February 20, 2017. The next day, Koki Uchiyama (Chairman of Hottolink) used this as a catalyst to terminate my employment with Effyis.

Under my Michigan employment agreement with Effyis (and guaranteed by Hottolink), my Michigan attorney felt strongly that Effyis owed me $566,000 in additional wages to cover the two remaining years in the contract.

However, I have decided to waive this payment in exchange for immediate payment by Hottolink to me of ~$900,000 in outstanding debt that Hottolink owes me.

4

In addition, I require Hottolink to waive their rights to sue me in the USA or Japan for any reason resulting from my associations with Effyis and Hottolink.

My Michigan attorney (Daniel, cc'ed here) will prepare a waiver covering the USA.

Are you able to create a similar waiver document, in Japanese and subject to the appropriate Japanese laws, that does the following:

1) waives Hottolink's right to pursue claims against me in Japan, or the USA

2) states that Hottolink will indemnify me against any claims arising from Hottolink's or Effyis's shareholders, creditors, auditors or any other stakeholder, past and previous

3) allows me specifically, to work with Effyis to obtain financing for Effyis, Inc., Effyis Acquisition Inc. and any of their affiliates.

Please let me know your thoughts. Thank you!

-DK

R. 36-2, PageID: 690.[1]

## C. The Companies send Kelly a draft agreement, which Kelly never signs.

On April 19, 2017—a week after the April 12 email exchange—Purdon emailed Kelly a draft Mutual Settlement Agreement with the following message: "Please find the draft agreement attached. Please add your edits and/or questions as needed so we can finalize[] this ASAP." R. 30-2, PageID: 424. The proposed agreement detailed the terms of the parties' mutual release of claims and Hottolink's payment schedule. It included new provisions such as confidentiality and cooperation agreements and a revocation provision, which provided:

> Kelly . . . has twenty-one (21) days within which to consider this Agreement, which period commences on the date such Agreement is presented to him. If Kelly elects to execute this Agreement prior to expiration of twenty-one days from receipt of this Agreement, he warrants that he has done so knowingly, understandably and voluntarily. This Agreement will become effective only after the expiration of seven (7) calendar days following its execution by Kelly, and may be revoked by him at any time during that seven-day (7) period by delivering a signed revocation notice to [the Companies' attorney.]

---

[1] Neither the parties nor the district court discussed the fact that Kelly forwarded to Purdon his email to his attorneys. But the "FYI" forward is clearly part of April 12 email exchange. *See* R. 36-2, PageID: 690.

R. 1-3, PageID: 42 (emphasis omitted). The draft agreement also included an integration clause, providing that Kelly would execute the agreement "without any reliance upon any statements or representations other than those set forth in [the] Agreement." *Id.* at 46.

Kelly did not respond to Purdon's email. In August 2017—four months after the April 12 email exchange—Purdon emailed Kelly and explained that Uchiyama "wanted an update/timeline for reviewing and hopefully signing the Settlement Agreement." R. 30-2, PageID: 438. Kelly responded that he was still reviewing his legal and tax situation.

At Effyis's board meeting in September 2017, Purdon said he believed that Kelly would "eventually settle, but on his own timeline." R. 35-3, PageID: 596. Nine months later, the Effyis board discussed the direction of the negotiations at its June 2018 meeting. The minutes of the board meeting provide:

**Darren Kelly Update**

- Effyis has provided recommendations for removing the DK issue (salary payoff) based on knowledge of the situation and consulting with attorneys familiar with the issue; however, it is unclear if Hottolink is motivated to settle with DK or if HL sees DK as a roadblock or threat to the business[.]

- It is our opinion that we (Effyis and HL) need to avoid negotiating against ourselves - rather focus on getting on the same page (be one team). Once we get on the same page we can come to a positive consensus on what to do next to move the business forward. We believe if HL doesn't want a full settlement than [sic] we shouldn't contact DK - see if he contacts us first[.]

- Mr. Uchiyama expressed that he did not support the direction the Effyis team collectively came up with. He felt the risk of potentially losing a lawsuit or the distraction it would bring was lower than the reward of not paying DK.

R. 35-4, PageID: 600–01.

**D. The Companies sue Kelly in October 2018.**

Four months later, on October 31, 2018—a year and a half after the initial April 12, 2017, email exchange—Hottolink and Effyis filed a three-count complaint seeking declaratory judgments that the parties had reached a settlement agreement and that Kelly had been terminated

for cause under the employment agreement. The Companies also sought damages for Kelly's alleged breach of fiduciary duties. Kelly counterclaimed, arguing that the Companies breached the employment agreement when they terminated him without cause.

The Companies moved for summary judgment on the declaratory-judgment claim regarding the settlement agreement and on Kelly's breach-of-contract counterclaim. The district court granted the Companies' motion, finding that the parties formed a valid settlement agreement on April 12, 2017, which foreclosed Kelly's breach-of-contract counterclaim. *Effyis, Inc. v. Kelly*, No. 18-13391, 2019 WL 5653380, at *3–4 (E.D. Mich. Oct. 31, 2019).[2] Kelly filed this timely appeal.

## II.

We review a grant of summary judgment de novo. *Goodman v. J.P. Morgan Inv. Mgmt., Inc.*, 954 F.3d 852, 859 (6th Cir. 2020). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To reverse the district court's grant of summary judgment, the nonmoving party must "present sufficient evidence to permit a reasonable jury to find in its favor." *Willard v. Huntington Ford, Inc.*, 952 F.3d 795, 805 (6th Cir. 2020) (citation omitted). It is a jury's responsibility, not ours, to make credibility determinations, weigh the evidence, and draw legitimate inferences from the facts presented. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Federal courts sitting in diversity apply the substantive law of the forum state and federal procedural law. *See generally Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938). When interpreting contracts in a diversity action, we apply the parties' contractual choice of governing law. *Savedoff*

---

[2] The Companies had also moved to file an amended answer to Kelly's counterclaim. Because the district court granted the Companies' motion for summary judgment, it denied as moot the motion to file an amended answer. *Effyis*, 2019 WL 5653380, at *1.

*v. Access Grp., Inc.*, 524 F.3d 754, 762 (6th Cir. 2008) (citing *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 596 (1991)). Here, the parties agree that Michigan law governs their dispute.

Kelly argues that the parties never reached a meeting of the minds on April 12, 2017, because the parties were engaged in mere negotiations and did not agree on the essential terms of the settlement. He says that his acceptance of any settlement offer was contingent upon: (1) a retraction of Uchiyama's allegations and (2) a timely completion of the settlement. The Companies respond that Kelly unequivocally accepted Purdon's offer to enter into a future settlement agreement. And they assert that any conditions included in Kelly's acceptance were immaterial to the contract.[3]

Settlement agreements are contracts, governed by the legal principles applicable to contracts generally. *Mastaw v. Naiukow*, 306 N.W.2d 378, 380 (Mich. Ct. App. 1981). So, to determine if a binding settlement agreement has been reached, we determine whether there was an offer, acceptance, consideration, and mutual assent on all of the essential terms of the settlement agreement. *Calhoun Cnty. v. Blue Cross Blue Shield Mich.*, 824 N.W.2d 202, 209 (Mich. Ct. App. 2012); *Kloian v. Domino's Pizza L.L.C.*, 733 N.W.2d 766, 770 (Mich. Ct. App. 2006) (per curiam). A contract to enter into a future settlement agreement—i.e., a contract to contract—may be valid under Michigan law if it specifies all of the "material and essential terms and leave[s] none to be agreed upon as the result of future negotiations." *Heritage Broad. Co. v. Wilson Commc'ns, Inc.*, 428 N.W.2d 784, 787 (Mich. Ct. App. 1988). But a transaction is complete only when the parties

---

[3] The Companies also assert that Kelly forfeited his counteroffer argument because he failed to raise it before the district court. *See* Appellees' Br. at 11–13. But Kelly did raise this argument in his response brief to the Companies' motion for summary judgment. *See, e.g.*, R. 35, PageID: 569 ("The April 2017 email exchange only contains *conditions* to a settlement or discussions about a possible settlement . . . ."); *id.* at 571 (arguing that Kelly "proposed additional terms that were essentially a counteroffer," which the Companies "never accepted or rejected"). The Companies also contend that Kelly waived any opportunity for an evidentiary hearing because he never challenged the credibility of the evidence. Appellees' Br. at 12. The Companies appear to misunderstand Kelly's appeal. By challenging the district court's grant of summary judgment, Kelly necessarily argues that there are genuine disputes of material fact and that the Companies are not entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). These arguments are therefore meritless.

mean it to be complete. *Opdyke Inv. Co. v. Norris Grain Co.*, 320 N.W.2d 836, 838 (Mich. 1982) (citation omitted). In other words, "[c]ontractual liability is consensual and will not arise unless the parties mutually assent to be bound." *Barber v. SMH (US), Inc.*, 509 N.W.2d 791, 794 (Mich. Ct. App. 1993) (per curiam) (citation omitted).

An offer to contract is accepted when the offeree undertakes some unequivocal act showing an intent to be bound by the offer and all the legal consequences flowing from that offer. *Kloian*, 733 N.W.2d at 771. This act must be "unambiguous and in strict conformance with the offer." *Id.* at 770 (citation omitted). Accordingly, a counteroffer that materially alters the essential terms of the contract is a rejection of the original offer, not an acceptance. *Plastic Platers, Inc. v. MacDonald's Indus. Prods., Inc.*, No. 258061, 2006 WL 932395, at *2 (Mich. Ct. App. Apr. 11, 2006) (per curiam); *see also Heritage Broad. Co.*, 428 N.W.2d at 787 (holding that a detailed letter of intent amounted to a "contract to contract," because "there were no material and essential terms left to be agreed upon" and a "definitive agreement would have added only the mechanics necessary to accomplish the [transaction]").

Here, there are disputed questions of fact as to whether the parties intended to settle by way of the April 12 emails. We evaluate mutual assent according to "an objective standard, looking to the express words of the parties and their visible acts, not their subjective states of mind." *Kamalnath v. Mercy Mem'l Hosp. Corp.*, 487 N.W.2d 499, 503 (Mich. Ct. App. 1992) (citation omitted). By that standard, Kelly has shown that a jury could reasonably conclude that the parties did not mutually assent to the terms discussed in the April 12 email exchange.

Start with Kelly's emails. Kelly copied his attorneys on his response email to Purdon. He immediately sent a separate email to his attorneys, instructing them to draft documents that included an indemnification provision and allowed for Kelly to "obtain financing for Effyis, Inc.,

Effyis Acquisition Inc. and any of their affiliates." R. 36-2, PageID: 690.[4] Several hours later, Kelly emailed Purdon "FYI," forwarding the email he had sent to his attorneys. *Id.* That Kelly directed his attorneys to take further negotiation-related action is evidence that the April 12 exchange was part of an ongoing negotiation between the parties. That Kelly forwarded his email to his attorneys to Purdon supports this interpretation.

Nor did the Companies behave as if they had entered into a binding settlement agreement. On April 19, Purdon emailed Kelly with the purpose of *finalizing* the settlement. In that email, Purdon expressly asked for Kelly's "edits and/or questions" on the "draft agreement" so that the parties could "finalize[] [the settlement] ASAP." *See* R. 30-2, PageID: 424. This language does not support the Companies' position that the parties had agreed to the essential terms of a settlement. Moreover, the proposed agreement attached to Purdon's email made no mention of the April 12 discussion; it reads as the Companies' tentative offer, which placed Kelly in the role of a negotiating party. *Compare* R. 1-3, PageID: 42 ("If Kelly elects to *execute* this Agreement . . . he warrants that he has done so knowingly, understandably, and voluntarily. This Agreement will become effective only after the expiration of seven (7) calendar days following its *execution* by Kelly.") (emphasis omitted and emphases added), *with Kamalnath*, 487 N.W.2d at 503 ("An offer is a unilateral declaration of intention[] and is not a contract. A contract is made when both parties have *executed* or accepted it, and not before.") (emphasis added) (internal citations omitted). Further, the Companies' internal treatment of the settlement discussions—and the fact that they waited a year and a half to file their lawsuit—shows that an enforceable agreement had not been reached. *See* R. 35-3, PageID: 596 ("Purdon believes [Kelly] will *eventually settle*, but on his own timeline.") (emphasis added); R. 35-4, PageID: 601 ("[I]t is

---

[4] Effyis Acquisitions, Inc. was formed for purposes of the Hottolink-Effyis acquisition. R. 1, PageID: 3.

unclear if Hottolink is *motivated to settle* with DK or if HL sees DK as a roadblock or threat to the business.") (emphasis added); *id.* ("[W]e . . . need to avoid *negotiating against ourselves*.") (emphasis added); *id.* ("We believe *if HL doesn't want a full settlement* than we shouldn't contact DK . . . .") (emphasis added); *id.* ("Uchiyama expressed that he did not support the *direction* [of the negotiations that] the Effyis team collectively came up with.") (emphasis added).

Moreover, the specific terms in the April 12 email exchange are ambiguous. Kelly said that he "vigorously den[ied]" Uchiyama's allegations and would settle only if the allegations were "retracted in the waiver documents." R. 36-2, PageID: 691. The parties dispute the meaning of this language, specifically the meaning of the terms "retraction" and "waiver." Kelly argues that the language amounts to a counteroffer because it proposes an additional term that required Uchiyama to take "affirmative steps" to *retract* the accusations. Reply Br. at 12 (emphasis omitted). The Companies point out that the proposed agreement included a non-admission-of-fault provision, *see* R. 1-3, PageID: 41 ("All parties agree that this Agreement is not an admission of guilt or liability on the part of Kelly, Effyis or Hottolink . . . ."), which they argue is itself "a *retraction* of any prior statement or suggestion as to fault." Appellees' Br. at 18 (emphasis added). So, the Companies assert that the language is better characterized "as an expression of Kelly's intent as to the scope of the *waivers* [that the parties] agreed to execute [on April 12]." *Id.* (emphasis added).

Maybe so. But a reasonable jury could conclude that Kelly intended Uchiyama to retract the numerous allegations leveled against him in the termination notice. After all, "retraction" and "waiver" mean two different things. *Compare Black's Law Dictionary* (11th ed. 2019) (defining "retraction" as "[t]he act of taking or drawing back" or "an official statement that something one said previously is not true"), *with id.* (defining "waiver" as "[t]he voluntary relinquishment or abandonment—express or implied—of a legal right or advantage"). A reasonable jury could find

11

that Kelly would not settle unless Uchiyama formally retracted the specific accusations made in the Notice of Termination.[5]

Finally, there is evidence that the April 12 exchange lacked essential terms that had been part of the parties' negotiation discussions. The parties had discussed a financing provision that would have enabled Kelly to purchase Effyis from Hottolink. Kelly testified that Purdon's terms were "just a subset of everything we were talking about at the time" and that Kelly's "authority to go out and find financing" to purchase Effyis from Hottolink was a "very explicit" condition of the settlement. R. 30-5, PageID: 500–01. That Kelly mentioned the financing provision in the email to his attorneys on April 12, which he later forwarded to Purdon, bolsters his testimony. *See* R. 36-2, PageID: 690. And in the Notice of Termination, Uchiyama addressed Kelly's plan to re-purchase Effyis, *see* R. 1-4, PageID: 50, thereby supporting the conclusion that the April 12 email exchange did not include all of the material and essential terms of the agreement.

All of the foregoing evidence reveals disputes of material facts as to whether there was a meeting of the minds. Because there are fact disputes regarding the parties' intent to settle and the essential terms of the settlement, the district court erred by granting the Companies' motion for summary judgment.

## III.

The Companies make several counterarguments, insisting that there are no disputes of fact. First, they argue that Kelly's *subjective* intent on April 12 is irrelevant to whether he *objectively* manifested an intent to enter into a settlement agreement. Fair enough. But the parties' words and

---

[5] Kelly also argues that his acceptance was conditioned on a timely completion of the settlement. He says that it was unclear from Purdon's email whether the Companies' "intent was to accelerate [the Companies'] repayment of the loan" or "continue loan repayment under the terms of the loan." R. 35, PageID: 569–70. And he says that the parties never agreed on "any guidelines as to when and how [the Companies] should pay the $15,000 USD payment." *Id.* at 570. But this is a mere "scintilla of evidence" supporting the materiality of the timeliness condition. *See Anderson*, 477 U.S. at 252. Kelly does not show that the timeliness condition involved anything more than the "mechanics necessary to accomplish" the settlement agreement. *See Heritage Broad. Co.*, 428 N.W.2d at 787.

actions on and after April 12 objectively reflect their subjective understanding of events. And the primary goal of contract interpretation "is to honor the intent of the parties." *Mikonczyk v. Detroit Newspapers*, 605 N.W.2d 360, 362 (Mich. Ct. App. 1999) (per curiam) (citation omitted).

Second, the Companies say that Kelly's failure to refer to the retraction condition in his email to his attorneys evinces the non-essential nature of the condition. But the Companies overlook the fact that Kelly's attorneys were copied on his response email to Purdon and were therefore aware of the retraction condition.

Third, the Companies argue that even if Kelly did make a counteroffer, Purdon unequivocally accepted it. *See* R. 30-2, PageID: 421 ("Thank you DK! I'll pass along your confirmation so we move forward immediately."). Perhaps. This question cannot be answered, however, until a trier of fact determines whether the parties intended to settle on April 12 and whether the parties agreed on the essential terms of the agreement.

**IV.**

For the foregoing reasons, we **VACATE** the district court's order and **REMAND** for further proceedings consistent with this opinion.